Eliezer Drew (ED0625)
Grushko & Mittman, P.C.
551 Fifth Avenue, Suite 1601
New York, New York 10176
(212) 697 – 9500
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ALPHA CAPITAL ANSTALT,

                Plaintiffs,

    - against -

NESS ENERGY INTERNATIONAL, INC.

                Defendants.
------------------------------------------------------------------X

Index No.: 07 Civ. **9242(AKH)**

ECF CASE

**COMPLAINT**

     Plaintiff Alpha Capital Anstalt ("Alpha" or "Plaintiff"), by its attorneys, Grushko &

Mittman, P.C., as and for its Complaint against Defendant Ness Energy International, Inc.

("Ness" or "Defendant"), respectfully alleges as follows:

### PRELIMINARY STATEMENT

     This is an action for breach of contract. On May 31, 2006, the Plaintiff entered into a

Subscription Agreement with Ness to purchase a convertible note and warrants of Ness. Ness is

in default of numerous obligations under the Subscription Agreement and the Note. The Note is

now due. The Plaintiff made demand for payment but Ness has failed to make any payment on

the Note.

### PARTIES

    1.    Plaintiff Alpha Capital Anstalt is an entity incorporated under the laws of the

State of Lichtenstein with an office at Pradafant 7, 9490 Furstentums, Vaduz Lichtenstein.

2.      Defendant Ness Energy International, Inc. is an entity incorporated under the laws of the State of Washington with a last known address of 1508 Santa Fe Drive, Suite 202 Weatherford, TX 76086.

## JURISDICTION AND VENUE

3.      Jurisdiction is also based on 28 USC §1332 in that the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of a State and citizens or subjects of a different state or foreign state.

4.      Venue is proper in this district pursuant to 28 USC §1391(b) (2) because a substantial part of the events or omissions giving rise to the claim occurred in this District. Venue is further proper in this district because the agreement between the parties requires that any action brought to enforce the agreements be brought in this District.

## FACTUAL ALLEGATIONS

### The Transaction Documents

5.      On May 31, 2006 (the "Closing Date"), in New York, New York, Ness entered into a subscription agreement with the Plaintiff (the "Subscription Agreement"). A copy of the Subscription Agreement is attached as Exhibit A.

6.      Pursuant to the Subscription Agreement, the Plaintiff purchased from Ness in New York, New York, a note dated May 31, 2006, issued by Ness in the principal amount of $454,545.46 (the "Note"). The Note is convertible at the Plaintiffs election into Ness' common stock. A copy of the Note is attached as Exhibit B.

7.      Pursuant to the Subscription Agreement, the Plaintiff purchased from Ness in New York, New York, common stock purchase warrants dated and issued May 31, 2006.

2

    8.    Pursuant to the Subscription Agreement, NESS granted to Plaintiff registration rights regarding the common stock issuable upon conversion of the Note or exercise of the Warrants.

**Breach of Contract Claims**

    9.    Pursuant to the terms of the Subscription Agreement Ness was obligated to be current in all its reporting requirements with the Securities Exchange Commission ("SEC") under the Securities Exchange Act of 1934 until "the sooner of two years after the Closing Date or all the Shares and Warrant Shares have been sold or transferred by the" Plaintiff. Subscription Agreement at § 9(d). Such reports include forms 10KSB and 10QSB.

    10.    Ness was late in filing with the SEC its Form 10QSB for the third quarter of 2006, and its form 10KSB for the year ending 2006.

    11.    NESS has failed to file its Form 10QSB for the first quarter of 2007 that was required to be filed no later than May 15, 2007.

    12.    Pursuant to the terms of the Note, the Note was due on May 31, 2007 (the "Maturity Date").

    13.    Ness has not made any payments under the Notes.

    14.    Pursuant to the Subscription Agreement Section 11.1(iv), Ness was required to register the common stock issuable upon conversion of the Note and exercise of the Warrants with the SEC by filing a Registration Statement not later than 30 calendar days after the Closing Date, i.e. June 30, 3006, and having the Registration Statement declared effective not later than 120 calendar days after the Closing Date, i.e. September 28, 2006.

    15.    Ness was also obligated to ensure that the Registration Statement remained effective for two years after the date the Note and Warrants were issued, i.e. the Closing Date.

16.    Pursuant to Section 11.4 of the Subscription Agreement, the failure to timely file the Registration Statement, have the Registration Statement timely declared effective and maintain the effectiveness of the registration statement effective during the Effectiveness Period, are all Non-Registration Events.

17.    Upon the occurrence of a Non-Registration Event, Alpha is entitled to liquidated damages in the amount of one percent ("1%") of the Purchase Price (as defined in the Subscription Agreement it amounts to $400,000) for each 30 days that the Non-Registration Event persists (pro rata for any period shorter than 30 days).

18.    The Registration Statement was not filed until July 19, 2007, i.e. 19 days late.

19.    The Registration Statement was not declared effective by the SEC until October 8, 2006, i.e. eight days late.

20.    The Registration Statement ceased to be effective on May 15, 2007, when Ness failed to file its Form 10QSB for the three month period ending March 31, 2007.

21.    Pursuant to Sections 3.1 and 1.1 of the Note, upon an Event of Default an interest rate of 15% applied on all sums due on the Note.

22.    The Non-Registration Events and failure to pay all sums due on the Maturity Date are Events of Default which triggered the 15% interest rate on the Note during the pendency of the Events of Default, which is currently continuing.

**Plaintiff Demands Payment**

23.    On July 31, 2007 and again on September 12, 2007, Alpha, through counsel, sent a written demand for payment (each a "Demand Letter"). The Demand Letters are attached hereto as Exhibit C.

4

24. Despite the Demand Letters Ness has not made any payments and Ness forced the Plaintiff to bring this action to collect the Note and liquidated damages.

25. Pursuant to Section 4.5 of the Note, Ness is obligated to pay Alpha its costs of collection, including reasonable attorney's fees.

26. The Plaintiff has fulfilled all its obligations and fully performed under the Subscription Agreement and related documents.

27. There are no condition precedent to the Plaintiff's enforcement of Ness' obligations under the Note and Subscription Agreement.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract against NESS –Note Interest and Principle Payments)

28. The Plaintiffs repeat and re-allege the allegations of Paragraphs 1 through 27 as if fully set forth herein.

29. Pursuant to the Subscription Agreement Ness sold and the Plaintiff bought the Note.

30. The Plaintiff made the payment required to purchase the Note.

31. Ness failed to fulfill its registration obligations and the resulting Non-Registration Events were Events of Default under the Note.

32. Ness failed to make required payments on the Maturity Date, an Event of Default under the Note.

33. The Events of Default under the Note triggered an interest rate of 15% during the pendency of the Events of Default, which is continuing.

34. Interest has accrued, as of October 12, 2007, in the amount of $29,887.92.

35. Interest continues to accrue at a rate of $186.80 per day Note.

5

36.    Ness has breached the contract by failing to make any payments due under the

Note.

37.    As a direct result of this breach the Plaintiffs have been damaged as of the date of

this Complaint in an amount not less than $454,545.46 plus accrued interest.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Contract against Ness – Registration Rights)

38.    The Plaintiffs repeat and re-allege the allegations of Paragraphs 1 through 37 as if

fully set forth herein.

39.    Pursuant to the Subscription Agreement Ness was to file a Registration Statement

with the SEC no later than June 30, 2006 and to have it declared effective no later than

September 28, 2006 and keep the Registration Statement effective for two years.

40.    Ness filed the Registration Statement 19 days late.

41.    The Registration Statement was declared effective eight days late.

42.    The Registration Statement ceased to be effective on May 15 2007.

43.    Pursuant to the Subscription Agreement upon a Non-Registration Event the

Plaintiffs were entitled to liquidated damages an amount calculated on a daily basis at a rate

equivalent to one percent (1%) for the first thirty (30) days or part thereof, and two percent (2%)

for each thirty (30) days or part thereof, thereafter, of the Purchase Price of the Notes remaining

unconverted and purchase price of Shares issued upon conversion of the Notes and exercise of

Warrants owned of record by such holder which are subject to such Non-Registration Event.

44.    Liquidated damages have accrued, as of October 12, 2007, in the amount of

$27,619.

6

45. Liquidated damages continue to accrue at a rate of $4,000 for every 30 days the Registration Statement is not effective until the securities purchased pursuant to the Subscription Agreement are eligible for resale under Rule 144(k) promulgated pursuant to the 1933 Act.

46. Liquidated damages will continue to accrue through May 31, 2008 for another $26,933.33.

47. As a direct result of this breach the Plaintiffs have been damaged as of October 12, 2007, in an amount not less than $27,619.

**WHEREFORE**, Plaintiff, Alpha Capital Anstalt demands judgment against the Defendant as follows:

(a) Money damages against Ness on breach of contract claims for failure to make payments on the Note, not less than $454,545.46, plus accrued interest;

(b) Money damages against Ness on breach of contract claims for Non-Registration Events, as of October 12, 2007, not less than $27,619 plus any future accrued liquidated damages;

(c) Money Damages against Ness, on the Plaintiff's attorneys fees and costs in an amount to be determined at the end of this action;

(d) For such other relief as this Court may determine as fair and just.

New York, New York
Dated: October 12, 2007

GRUSHKO & MITTMAN, P.C.

By:

Eliezer Drew (ED0625)
Attorneys for Plaintiff
551 Fifth Avenue, Suite 1601
New York, New York 10176
(212) 697-9500
(212) 697-3575 (fax)

7

# Exhibit A

## SUBSCRIPTION AGREEMENT

**THIS SUBSCRIPTION AGREEMENT** (this "**Agreement**"), dated as of May 31, 2006, by and among Ness Energy International, Inc., a Washington corporation (the "**Company**"), and the subscribers identified on the signature page hereto (each a "**Subscriber**" and collectively "**Subscribers**").

**WHEREAS**, the Company and the Subscribers are executing and delivering this Agreement in reliance upon an exemption from securities registration afforded by the provisions of Section 4(2), Section 4(6) and/or Regulation D ("**Regulation D**") as promulgated by the United States Securities and Exchange Commission (the "**Commission**") under the Securities Act of 1933, as amended (the "**1933 Act**").

**WHEREAS**, the parties desire that, upon the terms and subject to the conditions contained herein, the Company shall issue and sell to the Subscribers, as provided herein, and the Subscribers, in the aggregate, shall purchase up to $1,022,727.29 (the "**Aggregate Principal Amount**") of principal amount of promissory notes of the Company ("**Note**" or "**Notes**"), a form of which is annexed hereto as **Exhibit A**, convertible into shares of the Company's common stock, no par value (the "**Common Stock**") at a per share conversion price set forth in the Note ("**Conversion Price**"); and share purchase warrants (the "**Warrants**"), in the form annexed hereto as **Exhibit B**, to purchase shares of Common Stock (the "**Warrant Shares**"). The Notes, shares of Common Stock issuable upon conversion of the Notes (the "**Shares**"), the Warrants and the Warrant Shares are collectively referred to herein as the "**Securities**"; and

**WHEREAS**, the aggregate proceeds of the sale of the Notes and the Warrants contemplated hereby shall be held in escrow pursuant to the terms of a Funds Escrow Agreement to be executed by the parties substantially in the form attached hereto as **Exhibit C** (the "**Escrow Agreement**").

**NOW, THEREFORE**, in consideration of the mutual covenants and other agreements contained in this Agreement the Company and the Subscribers hereby agree as follows:

1.  Conditions to Closing. Subject to the satisfaction or waiver of the terms and conditions of this Agreement, on the Closing Date, each Subscriber shall purchase and the Company shall sell to each Subscriber a Note in the principal amount designated on the signature page hereto. The principal amount of the Notes to be purchased by the Subscribers on the Closing Date shall, in the aggregate, be equal to the Aggregate Principal Amount. The aggregate purchase price for the Notes ("**Aggregate Purchase Price**") shall equal to the result of (x) divided by (y), where (x) equals the Aggregate Principal Amount and (y) equals 1.136363.

2.  Closing Date. The "**Closing Date**" shall be the date that subscriber funds representing the net amount due the Company from the Closing Purchase Price of the Offering [as defined in Section 8(b)] is transmitted by wire transfer or otherwise to or for the benefit of the Company. The consummation of the transactions contemplated herein for all Closings shall take place at the offices of Grushko & Mittman, P.C., 551 Fifth Avenue, Suite 1601, New York, New York 10176, upon the satisfaction of all conditions to Closing set forth in this Agreement.

3.  Warrants. On the Closing Date, the Company will issue and deliver Warrants to the Subscribers. One Class A Warrant will be issued for each one Share which would be issued on the Closing Date assuming the complete conversion of the Notes issued on the Closing Date at the Conversion Price in effect on the Closing Date. The per Warrant Share exercise price to acquire a Warrant Share upon exercise of a Class A Warrant shall be 108% of the average of the volume weighted average price of the Common Stock as reported by Bloomberg L.P. for the five trading days preceding the Closing Date. The Class A Warrants shall be exercisable until three years after the Closing Date, or five years after the

Closing Date if the Registration Statement [as defined in Section 11.1(iv)] is not declared effective by the Commission within one hundred and eighty days after the Closing Date.

        4.    Subscriber's Representations and Warranties. Each Subscriber hereby represents and warrants to and agrees with the Company only as to such Subscriber that:

        (a)    Organization and Standing of the Subscribers. If the Subscriber is an entity, such Subscriber is a corporation, partnership or other entity duly incorporated or organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization and has the requisite corporate power to own its assets and to carry on its business.

        (b)    Authorization and Power. Each Subscriber has the requisite power and authority to enter into and perform this Agreement and to purchase the Notes and Warrants being sold to it hereunder. The execution, delivery and performance of this Agreement by such Subscriber and the consummation by it of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate or partnership action, and no further consent or authorization of such Subscriber or its Board of Directors, stockholders, partners, members, as the case may be, is required. This Agreement has been duly authorized, executed and delivered by such Subscriber and constitutes, or shall constitute when executed and delivered, a valid and binding obligation of the Subscriber enforceable against the Subscriber in accordance with the terms thereof.

        (c)    No Conflicts. The execution, delivery and performance of this Agreement and the consummation by such Subscriber of the transactions contemplated hereby or relating hereto do not and will not (i) result in a violation of such Subscriber's charter documents or bylaws or other organizational documents or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of any agreement, indenture or instrument or obligation to which such Subscriber is a party or by which its properties or assets are bound, or result in a violation of any law, rule, or regulation, or any order, judgment or decree of any court or governmental agency applicable to such Subscriber or its properties (except for such conflicts, defaults and violations as would not, individually or in the aggregate, have a material adverse effect on such Subscriber). Such Subscriber is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency in order for it to execute, deliver or perform any of its obligations under this Agreement or to purchase the Notes or acquire the Warrants in accordance with the terms hereof, provided that for purposes of the representation made in this sentence, such Subscriber is assuming and relying upon the accuracy of the relevant representations and agreements of the Company herein.

        (d)    Information on Company. The Subscriber has been furnished with or has had access at the EDGAR Website of the Commission to the Company's Form 10-KSB for the year ended December 31, 2005 and all periodic reports filed with the Commission thereafter, but not later than five business days before the Closing Date (hereinafter referred to as the "**Reports**"). In addition, the Subscriber has received in writing from the Company such other information concerning its operations, financial condition and other matters as the Subscriber has requested in writing (such other information is collectively, the "**Other Written Information**"), and considered all factors the Subscriber deems material in deciding on the advisability of investing in the Securities.

        (e)    Information on Subscriber. The Subscriber is, and will be at the time of the conversion of the Notes and exercise of the Warrants, an "accredited investor", as such term is defined in Regulation D promulgated by the Commission under the 1933 Act, is experienced in investments and business matters, has made investments of a speculative nature and has purchased securities of United States publicly-owned companies in private placements in the past and, with its representatives, has such knowledge and experience in financial, tax and other business matters as to enable the Subscriber to utilize the information made available by the Company to evaluate the merits and risks of and to make an

informed investment decision with respect to the proposed purchase, which represents a speculative investment. The Subscriber has the authority and is duly and legally qualified to purchase and own the Securities. The Subscriber is able to bear the risk of such investment for an indefinite period and to afford a complete loss thereof. The information set forth on the signature page hereto regarding the Subscriber is accurate.

(f)     Purchase of Notes and Warrants. On the Closing Date, the Subscriber will purchase the Notes and Warrants as principal for its own account for investment only and not with a view toward, or for resale in connection with, the public sale or any distribution thereof, but Subscriber does not agree to hold the Notes and Warrants for any minimum amount of time.

(g)     Compliance with Securities Act. The Subscriber understands and agrees that the Securities have not been registered under the 1933 Act or any applicable state securities laws, by reason of their issuance in a transaction that does not require registration under the 1933 Act (based in part on the accuracy of the representations and warranties of Subscriber contained herein), and that such Securities must be held indefinitely unless a subsequent disposition is registered under the 1933 Act or any applicable state securities laws or is exempt from such registration. From the date the Subscriber received a written offer from the Company describing the Offering until the date of the public announcement or Form 8-K filing described in Section 9(m), the Subscriber will not have directly or indirectly purchased or sold Common Stock or Common Stock equivalents except as part of the Offering. Notwithstanding anything to the contrary contained in this Agreement, such Subscriber may transfer (without restriction and without the need for an opinion of counsel) the Securities to its Affiliates (as defined below) provided that each such Affiliate is an "accredited investor" under Regulation D and such Affiliate agrees to be bound by the terms and conditions of this Agreement. For the purposes of this Agreement, an "**Affiliate**" of any person or entity means any other person or entity directly or indirectly controlling, controlled by or under direct or indirect common control with such person or entity. Affiliate when employed in connection with the Company includes each Subsidiary [as defined in Section 5(a)] of the Company. For purposes of this definition, "**control**" means the power to direct the management and policies of such person or firm, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

(h)     Shares Legend. The Shares and the Warrant Shares shall bear the following or similar legend:

> "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE
> NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933,
> AS AMENDED. THESE SHARES MAY NOT BE SOLD, OFFERED
> FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF
> AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH
> SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES
> LAW OR AN OPINION OF COUNSEL REASONABLY
> SATISFACTORY TO NESS ENERGY INTERNATIONAL, INC.
> THAT SUCH REGISTRATION IS NOT REQUIRED."

(i)     Warrants Legend. The Warrants shall bear the following or similar legend:

> "THIS WARRANT AND THE COMMON SHARES ISSUABLE UPON
> EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED
> UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THIS
> WARRANT AND THE COMMON SHARES ISSUABLE UPON
> EXERCISE OF THIS WARRANT MAY NOT BE SOLD, OFFERED
> FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF

3

AN EFFECTIVE REGISTRATION STATEMENT AS TO THIS
WARRANT UNDER SAID ACT AND ANY APPLICABLE STATE
SECURITIES LAW OR AN OPINION OF COUNSEL REASONABLY
SATISFACTORY TO NESS ENERGY INTERNATIONAL, INC.
THAT SUCH REGISTRATION IS NOT REQUIRED."

       (j)     Note Legend. The Note shall bear the following legend:

"THIS NOTE AND THE COMMON SHARES ISSUABLE UPON
CONVERSION OF THIS NOTE HAVE NOT BEEN REGISTERED
UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THIS
NOTE AND THE COMMON SHARES ISSUABLE UPON
CONVERSION OF THIS NOTE MAY NOT BE SOLD, OFFERED
FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF
AN EFFECTIVE REGISTRATION STATEMENT AS TO THIS NOTE
UNDER SAID ACT AND ANY APPLICABLE STATE SECURITIES
LAW OR AN OPINION OF COUNSEL REASONABLY
SATISFACTORY TO NESS ENERGY INTERNATIONAL, INC.
THAT SUCH REGISTRATION IS NOT REQUIRED."

       (k)     Communication of Offer. The offer to sell the Securities was directly communicated to the Subscriber by the Company. At no time was the Subscriber presented with or solicited by any leaflet, newspaper or magazine article, radio or television advertisement, or any other form of general advertising or solicited or invited to attend a promotional meeting otherwise than in connection and concurrently with such communicated offer.

       (l)     Authority; Enforceability. This Agreement and other agreements delivered together with this Agreement or in connection herewith have been duly authorized, executed and delivered by the Subscriber and are valid and binding agreements enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights generally and to general principles of equity; and Subscriber has full corporate power and authority necessary to enter into this Agreement and such other agreements and to perform its obligations hereunder and under all other agreements entered into by the Subscriber relating hereto.

       (m)     No Governmental Review. Each Subscriber understands that no United States federal or state agency or any other governmental or state agency has passed on or made recommendations or endorsement of the Securities or the suitability of the investment in the Securities nor have such authorities passed upon or endorsed the merits of the offering of the Securities.

       (n)     Correctness of Representations. Each Subscriber represents as to such Subscriber that the foregoing representations and warranties are true and correct as of the date hereof and, unless a Subscriber otherwise notifies the Company prior to the Closing Date, shall be true and correct as of the Closing Date.

       (o)     Survival. The foregoing representations and warranties shall survive the Closing Date until three years after the Closing Date.

     5.     Company Representations and Warranties. The Company represents and warrants to and agrees with each Subscriber that except as set forth in the Reports or the Other Written Information and as otherwise qualified in the Transaction Documents:

4

(a)     Due Incorporation. The Company is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has the requisite corporate power to own its properties and to carry on its business is disclosed in the Reports. The Company is duly qualified as a foreign corporation to do business and is in good standing in each jurisdiction where the nature of the business conducted or property owned by it makes such qualification necessary, other than those jurisdictions in which the failure to so qualify would not have a Material Adverse Effect. For purpose of this Agreement, a **"Material Adverse Effect"** shall mean a material adverse effect on the financial condition, results of operations, properties or business of the Company taken individually, or in the aggregate, as a whole. For purposes of this Agreement, **"Subsidiary"** means, with respect to any entity at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity) of which more than 50% of (i) the outstanding capital stock having (in the absence of contingencies) ordinary voting power to elect a majority of the board of directors or other managing body of such entity, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such entity. All the Company's Subsidiaries as of the Closing Date are set forth on **Schedule 5(a)** hereto.

(b)     Outstanding Stock. All issued and outstanding shares of capital stock of the Company have been duly authorized and validly issued and are fully paid and nonassessable.

(c)     Authority; Enforceability. This Agreement, the Note, the Warrants, the Escrow Agreement, and any other agreements delivered together with this Agreement or in connection herewith (collectively **"Transaction Documents"**) have been duly authorized, executed and delivered by the Company and are valid and binding agreements enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights generally and to general principles of equity. The Company has full corporate power and authority necessary to enter into and deliver the Transaction Documents and to perform its obligations thereunder.

(d)     Additional Issuances. There are no outstanding agreements or preemptive or similar rights affecting the Company's common stock or equity and no outstanding rights, warrants or options to acquire, or instruments convertible into or exchangeable for, or agreements or understandings with respect to the sale or issuance of any shares of common stock or equity of the Company or other equity interest in any of the Subsidiaries of the Company except as described on **Schedule 5(d)**. The Common stock of the Company on a fully diluted basis outstanding as of the last trading day preceding the Closing Date is set forth on **Schedule 5(d)**.

(e)     Consents. No consent, approval, authorization or order of any court, governmental agency or body or arbitrator having jurisdiction over the Company, or any of its Affiliates, any Principal Market (as defined in Section 9(b) of this Agreement), nor the Company's shareholders is required for the execution by the Company of the Transaction Documents and compliance and performance by the Company of its obligations under the Transaction Documents, including, without limitation, the issuance and sale of the Securities.

(f)     No Violation or Conflict. Assuming the representations and warranties of the Subscribers in Section 4 are true and correct, neither the issuance and sale of the Securities nor the performance of the Company's obligations under this Agreement and all other agreements entered into by the Company relating thereto by the Company will:

(i)     violate, conflict with, result in a breach of, or constitute a default (or an event which with the giving of notice or the lapse of time or both would be reasonably likely to

5

constitute a default in any material respect) under (A) the articles or certificate of incorporation, charter or bylaws of the Company, (B) to the Company's knowledge, any decree, judgment, order, law, treaty, rule, regulation or determination applicable to the Company of any court, governmental agency or body, or arbitrator having jurisdiction over the Company or over the properties or assets of the Company or any of its Affiliates, (C) the terms of any bond, debenture, note or any other evidence of indebtedness, or any agreement, stock option or other similar plan, indenture, lease, mortgage, deed of trust or other instrument to which the Company or any of its Affiliates is a party, by which the Company or any of its Affiliates is bound, or to which any of the properties of the Company or any of its Affiliates is subject, or (D) the terms of any "lock-up" or similar provision of any underwriting or similar agreement to which the Company, or any of its Affiliates is a party except the violation, conflict, breach, or default of which would not have a Material Adverse Effect; or

        (ii)    result in the creation or imposition of any lien, charge or encumbrance upon the Securities or any of the assets of the Company or any of its Affiliates; or

        (iii)    result in the activation of any anti-dilution rights or a reset or repricing of any debt or security instrument of any current, former or future creditor or equity holder of the Company, nor result in the acceleration of the due date of any obligation of the Company; or

        (iv)    result in the activation of any piggy-back registration rights of any person or entity holding securities or debt of the Company or having the right to receive securities of the Company.

        (g)    The Securities. The Securities upon issuance:

        (i)    are, or will be, free and clear of any security interests, liens, claims or other encumbrances, subject to restrictions upon transfer under the 1933 Act and any applicable state securities laws;

        (ii)    have been, or will be, duly and validly authorized and on the date of conversion of the Notes and upon exercise of the Warrants, the Shares and Warrant Shares will be duly and validly issued, fully paid and nonassessable and, if registered pursuant to the 1933 Act and resold pursuant to an effective registration statement, will be free trading and unrestricted;

        (iii)    will not have been issued or sold in violation of any preemptive or other similar rights of the holders of any securities of the Company;

        (iv)    will not subject the holders thereof to personal liability by reason of being such holders provided Subscriber's representations herein are true and accurate and Subscribers take no actions or fail to take any actions required for their purchase of the Securities to be in compliance with all applicable laws and regulations; and

        (v)    will have been issued in reliance upon an exemption from the registration requirements of and will not result in a violation of Section 5 under the 1933 Act.

        (h)    Litigation. Other than as described in the Reports, there is no pending or, to the best knowledge of the Company, threatened action, suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Company, or any of its Affiliates that would affect the execution by the Company or the performance by the Company of its obligations under the Transaction Documents. Except as disclosed in the Reports, there is no pending or, to the best knowledge of the Company, basis for or threatened action, suit, proceeding or investigation before any court, governmental agency or body, or arbitrator having jurisdiction over the Company, or any of its Affiliates which litigation if adversely determined would have a Material Adverse Effect.

(i)     Reporting Company. The Company is a publicly-held company subject to reporting obligations pursuant to Section 13 of the Securities Exchange Act of 1934 (the **"1934 Act"**) and has a class of common shares registered pursuant to Section 12(g) of the 1934 Act. Pursuant to the provisions of the 1934 Act, the Company has timely filed all reports and other materials required to be filed thereunder with the Commission during the preceding twelve months, except for the report on Form 10-QSB for the quarter ended March 31, 2006 which was filed on May 24, 2006.

(j)     No Market Manipulation. The Company and its Affiliates have not taken, and will not take, directly or indirectly, any action designed to, or that might reasonably be expected to, cause or result in stabilization or manipulation of the price of the Common Stock to facilitate the sale or resale of the Securities or affect the price at which the Securities may be issued or resold, provided, however, that this provision shall not prevent the Company from engaging in investor relations/public relations activities consistent with past practices.

(k)     Information Concerning Company. The Reports contain all material information relating to the Company and its operations and financial condition as of their respective dates and all the information required to be disclosed therein. Since the last day of the fiscal year of the most recent audited financial statements included in the Reports (**"Latest Financial Date"**), and except as modified in the Other Written Information or in the Schedules hereto, there has been no Material Adverse Event relating to the Company's business, financial condition or affairs not disclosed in the Reports. The Reports do not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances when made. The Company has not provided to the Subscribers any material non-public information.

(l)     Stop Transfer. The Company will not issue any stop transfer order or other order impeding the sale, resale or delivery of any of the Securities, except as may be required by any applicable federal or state securities laws and unless contemporaneous notice of such instruction is given to the Subscriber.

(m)     Defaults. The Company is not in violation of its articles of incorporation or bylaws. The Company is (i) not in default under or in violation of any other material agreement or instrument to which it is a party or by which it or any of its properties are bound or affected, which default or violation would have a Material Adverse Effect, (ii) not subject to nor in default with respect to any order of any court, arbitrator or governmental body or subject to or party to any order of any court or governmental authority arising out of any action, suit or proceeding under any statute or other law respecting antitrust, monopoly, restraint of trade, unfair competition or similar matters, or (iii) to the Company's knowledge not in violation of any statute, rule or regulation of any governmental authority which violation would have a Material Adverse Effect.

(n)     Not an Integrated Offering. Neither the Company, nor any of its Affiliates, nor any person acting on its or their behalf, has directly or indirectly made any offers or sales of any security or solicited any offers to buy any security under circumstances that would cause the offer of the Securities pursuant to this Agreement to be integrated with prior offerings by the Company for purposes of the 1933 Act or any applicable stockholder approval provisions, including, without limitation, under the rules and regulations of the OTC Bulletin Board (**"Bulletin Board"**) which would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder. Nor will the Company or any of its Affiliates take any action or steps that would cause the offer or issuance of the Securities to be integrated with other offerings which would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder. The Company will not conduct any offering other than the transactions contemplated hereby that will be integrated with the offer or issuance of the Securities, which would impair the exemptions relied upon in this Offering or the Company's ability to timely comply with its obligations hereunder.

7

(o)    No General Solicitation.  Neither the Company, nor any of its Affiliates, nor to its knowledge, any person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D under the 1933 Act) in connection with the offer or sale of the Securities.

(p)    Listing.  The Company's common stock is quoted on the Bulletin Board under the symbol NESS. The Company has not received any oral or written notice that the Common Stock is not eligible nor will become ineligible for quotation on the Bulletin Board nor that the Common Stock does not meet all requirements for the continuation of such quotation.  The Company satisfies all the requirements for the continued quotation of the Common Stock on the Bulletin Board.

(q)    No Undisclosed Liabilities.  The Company has no liabilities or obligations which are material, individually or in the aggregate, which are not disclosed in the Reports and Other Written Information, other than those incurred in the ordinary course of the Company's businesses since the Latest Financial Date, and which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, except as disclosed on **Schedule 5(q)**.

(r)    No Undisclosed Events or Circumstances.  Since the Latest Financial Date, no event or circumstance has occurred or exists with respect to the Company or its businesses, properties, operations or financial condition, that, under applicable law, rule or regulation, requires public disclosure or announcement prior to the date hereof by the Company but which has not been so publicly announced or disclosed in the Reports.

(s)    Capitalization.  The authorized and outstanding capital stock of the Company and Subsidiaries as of the date of this Agreement and the Closing Date (not including the Securities) are set forth on **Schedule 5(d)**.  Except as set forth on **Schedule 5(d)**, there are no options, warrants, or rights to subscribe to, securities, rights or obligations convertible into or exchangeable for or giving any right to subscribe for any shares of capital stock of the Company or any of its Subsidiaries.  All of the outstanding shares of Common Stock of the Company have been duly and validly authorized and issued and are fully paid and nonassessable.

(t)    Dilution.  The Company's executive officers and directors understand the nature of the Securities being sold hereby and recognize that the issuance of the Securities will have a potential dilutive effect on the equity holdings of other holders of the Company's equity or rights to receive equity of the Company.  The board of directors of the Company has concluded, in its good faith business judgment, that the issuance of the Securities is in the best interests of the Company.  The Company specifically acknowledges that its obligation to issue the Shares upon conversion of the Notes, and the Warrant Shares upon exercise of the Warrants is binding upon the Company and enforceable regardless of the dilution such issuance may have on the ownership interests of other shareholders of the Company or parties entitled to receive equity of the Company.

(u)    No Disagreements with Accountants and Lawyers.  There are no disagreements of any kind presently existing, or reasonably anticipated by the Company to arise, between the Company and the accountants and lawyers formerly or presently employed by the Company, including but not limited to disputes or conflicts over payment owed to such accountants and lawyers.

(v)    DTC Status/Transfer Agent.  The Company's transfer agent is eligible to participate in and the Common Stock is eligible for transfer pursuant to the Depository Trust Company Automated Securities Transfer Programs.  The name, address, telephone number, fax number, contact person and email address of the Company transfer agent are set forth on **Schedule 5(v)** hereto.

(w)    Investment Company.  Neither the Company nor any Affiliate is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

8

(x)    Subsidiary Representations. The Company makes each of the representations contained in Sections 5(a), (b), (d), (e), (f), (h), (k), (m), (q), (r), (s), (u) and (w) of this Agreement, as same relate to each Subsidiary of the Company, with the same qualifications to each such representation.

(y)    Correctness of Representations. The Company represents that the foregoing representations and warranties are true and correct as of the date hereof in all material respects, and, unless the Company otherwise notifies the Subscribers prior to the Closing Date, shall be true and correct in all material respects as of the Closing Date.

(z)    Survival. The foregoing representations and warranties shall survive until three years after the Closing Date.

6.    Regulation D Offering. The offer and issuance of the Securities to the Subscribers is being made pursuant to the exemption from the registration provisions of the 1933 Act afforded by Section 4(2) or Section 4(6) of the 1933 Act and/or Rule 506 of Regulation D promulgated thereunder. On the Closing Date, the Company will provide an opinion reasonably acceptable to Subscriber from the Company's legal counsel opining on the availability of an exemption from registration under the 1933 Act as it relates to the offer and issuance of the Securities and other matters reasonably requested by Subscribers. A form of the legal opinion is annexed hereto as **Exhibit D**. The Company will provide, at the Company's expense, such other legal opinions in the future as are reasonably necessary for the issuance and resale of the Common Stock issuable upon conversion of the Notes and exercise of the Warrants pursuant to an effective registration statement or an exemption from registration.

7.1.    Conversion of Note.

(a)    Upon the conversion of a Note or part thereof, the Company shall, at its own cost and expense, take all necessary action, including obtaining and delivering, an opinion of counsel acceptable to the Company's transfer agent, so that the Company's transfer agent shall issue stock certificates in the name of Subscriber (or its nominee) or such other persons as designated by Subscriber and in such denominations to be specified at conversion representing the number of shares of Common Stock issuable upon such conversion. The Company warrants that no instructions other than these instructions have been or will be given to the transfer agent of the Company's Common Stock and that, unless waived by the Subscriber, the Shares will be free-trading, and freely transferable, and will not contain a legend restricting the resale or transferability of the Shares, provided the Subscriber represents that the Shares are or will be sold pursuant to an effective registration statement covering the Shares or exemption from registration, or are otherwise exempt from registration.

(b)    Subscriber will give notice of its decision to exercise its right to convert the Note, interest, any sum due to the Subscriber under the Transaction Documents including Liquidated Damages, or part thereof by telecopying an executed and completed **Notice of Conversion** (a form of which is annexed as **Exhibit A** to the Note) to the Company via confirmed telecopier transmission or otherwise pursuant to Section 13(a) of this Agreement. The Subscriber will not be required to surrender the Note until the Note has been fully converted or satisfied. Each date on which a Notice of Conversion is telecopied to the Company in accordance with the provisions hereof shall be deemed a **Conversion Date**. The Company will itself or cause the Company's transfer agent to transmit the Company's Common Stock certificates representing the Shares issuable upon conversion of the Note to the Subscriber via express courier for receipt by such Subscriber within three (3) business days after receipt by the Company of the Notice of Conversion (such third day being the **"Delivery Date"**). In the event the Shares are electronically transferable, then delivery of the Shares <u>must</u> be made by electronic transfer provided request for such electronic transfer has been made by the Subscriber and the Subscriber has complied with all applicable securities laws in connection with the sale of the Common Stock, including, without

9

limitation, the prospectus delivery requirements.  A Note representing the balance of the Note not so converted will be provided by the Company to the Subscriber if requested by Subscriber, provided the Subscriber delivers the original Note to the Company. In the event that a Subscriber elects not to surrender a Note for reissuance upon partial payment or conversion, the Subscriber hereby indemnifies the Company against any and all loss or damage attributable to a third-party claim in an amount in excess of the actual amount then due under the Note. "**Business day**" and "**trading day**" as employed in the Transaction Documents is a day that the New York Stock Exchange is open for trading for three or more hours.

     (c) The Company understands that a delay in the delivery of the Shares in the form required pursuant to Section 7.1 hereof, or the Mandatory Redemption Amount described in Section 7.2 hereof, respectively after the Delivery Date or the Mandatory Redemption Payment Date (as hereinafter defined) could result in economic loss to the Subscriber. As compensation to the Subscriber for such loss, the Company agrees to pay (as liquidated damages and not as a penalty) to the Subscriber for late issuance of Shares in the form required pursuant to Section 7.1 hereof upon Conversion of the Note in the amount of $100 per business day after the Delivery Date for each $10,000 of Note principal amount being converted of the corresponding Shares which are not timely delivered. The Company shall pay any payments incurred under this Section in immediately available funds upon demand. Furthermore, in addition to any other remedies which may be available to the Subscriber, in the event that the Company fails for any reason to effect delivery of the Shares by the Delivery Date or make payment by the Mandatory Redemption Payment Date, the Subscriber may revoke all or part of the relevant Notice of Conversion or rescind all or part of the notice of Mandatory Redemption by delivery of a notice to such effect to the Company whereupon the Company and the Subscriber shall each be restored to their respective positions immediately prior to the delivery of such notice, except that the liquidated damages described above shall be payable through the date notice of revocation or rescission is given to the Company.

     (d) Nothing contained herein or in any document referred to herein or delivered in connection herewith shall be deemed to establish or require the payment of a rate of interest or other charges in excess of the maximum permitted by applicable law. In the event that the rate of interest or dividends or damages required to be paid or other charges hereunder exceed the maximum permitted by such law, any payments in excess of such maximum shall be credited against amounts owed by the Company to the Subscriber and thus refunded to the Company.

     7.2. Mandatory Redemption at Subscriber's Election. In the event (i) the Company is prohibited from issuing Shares, (ii) the Company fails to timely deliver Shares on a Delivery Date, (iii) upon the occurrence of any other Event of Default (as defined in the Note or in this Agreement), any of the foregoing that continues for more than twenty (20) business days, or (iv) of the liquidation, dissolution or winding up of the Company, then at the Subscriber's election, the Company must pay to the Subscriber ten (10) business days after request by the Subscriber ("**Calculation Period**"), a sum of money determined by multiplying up to the outstanding principal amount of the Note designated by the Subscriber by the greater of (y) 120%, or (z) a fraction in which the numerator is the highest closing price of the Common Stock during the Calculation Period and the denominator is the lowest applicable Conversion Price during the Calculation Period, together with accrued but unpaid interest thereon ("**Mandatory Redemption Payment**"). The Mandatory Redemption Payment must be received by the Subscriber on the same date as the Shares otherwise deliverable or within ten (10) business days after request, whichever is sooner ("**Mandatory Redemption Payment Date**"). Upon receipt of the Mandatory Redemption Payment, the corresponding Note principal and interest will be deemed paid and no longer outstanding. Liquidated damages calculated pursuant to Section 7.1(c) hereof, that have been paid or accrued for the ten day period prior to the actual receipt of the Mandatory Redemption Payment by the Subscriber shall be credited against the Mandatory Redemption Payment.

     7.3. Maximum Conversion. The Subscriber shall not be entitled to convert on a Conversion Date that amount of the Note in connection with that number of shares of Common Stock

10

which would be in excess of the sum of (i) the number of shares of common stock beneficially owned by the Subscriber and its Affiliates on a Conversion Date, and (ii) the number of shares of Common Stock issuable upon the conversion of the Note with respect to which the determination of this provision is being made on a Conversion Date, which would result in beneficial ownership by the Subscriber and its Affiliates of more than 4.99% of the outstanding shares of common stock of the Company on such Conversion Date. Beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended, and Regulation 13d-3 thereunder. Subject to the foregoing, the Subscriber shall not be limited to aggregate conversions of only 4.99% and aggregate conversions by the Subscriber may exceed 4.99%. The Subscriber may waive the conversion limitation described in this Section 7.3, in whole or in part, upon and effective after 61 days prior written notice to the Company to increase such percentage to up to 9.99%. The Subscriber may decide whether to convert a Note or exercise Warrants to achieve an actual 4.99% or up to 9.99% ownership position as described above.

7.4.    Injunction Posting of Bond. In the event a Subscriber shall elect to convert a Note or part thereof or exercise the Warrant in whole or in part, the Company may not refuse conversion or exercise based on any claim that such Subscriber or any one associated or affiliated with such Subscriber has been engaged in any violation of law, or for any other reason, unless, an injunction from a court, on notice, restraining and or enjoining conversion of all or part of such Note or exercise of all or part of such Warrant shall have been sought and obtained by the Company or at the Company's request or with the Company's assistance, and the Company has posted a surety bond for the benefit of such Subscriber in the amount of 120% of the outstanding principal and interest of the Note, or aggregate purchase price of the Shares and Warrant Shares which are sought to be subject to the injunction, which bond shall remain in effect until the completion of arbitration/litigation of the dispute and the proceeds of which shall be payable to such Subscriber to the extent Subscriber obtains judgment in Subscriber's favor.

7.5.    Buy-In. In addition to any other rights available to the Subscriber, if the Company fails to deliver to the Subscriber such shares issuable upon conversion of a Note by the Delivery Date and if after six (6) business days after the Delivery Date the Subscriber or a broker on the Subscriber's behalf, purchases (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by such Subscriber of the Common Stock which the Subscriber was entitled to receive upon such conversion (a "Buy-In"), then the Company shall pay in cash to the Subscriber (in addition to any remedies available to or elected by the Subscriber) the amount by which (A) the Subscriber's total purchase price (including brokerage commissions, if any) for the shares of Common Stock so purchased exceeds (B) the aggregate principal and/or interest amount of the Note for which such conversion was not timely honored, together with interest thereon at a rate of 15% per annum, accruing until such amount and any accrued interest thereon is paid in full (which amount shall be paid as liquidated damages and not as a penalty). For example, if the Subscriber purchases shares of Common Stock having a total purchase price of $11,000 to cover a Buy-In with respect to an attempted conversion of $10,000 of note principal and/or interest, the Company shall be required to pay the Subscriber $1,000, plus interest. The Subscriber shall provide the Company written notice indicating the amounts payable to the Subscriber in respect of the Buy-In.

7.6    Adjustments.  The Conversion Price, Warrant exercise price and amount of Shares issuable upon conversion of the Notes and exercise of the Warrants shall be adjusted as described in this Agreement, the Notes and Warrants.

7.7.    Redemption.  The Securities shall not be redeemable or mandatorily convertible except as described in the Note and Warrants.

8.    Broker/Legal Fees.

(a)    Broker's Commission. The Company on the one hand, and each Subscriber (for himself only) on the other hand, agrees to indemnify the other against and hold the other

11

harmless from any and all liabilities to any persons claiming brokerage commissions or similar fees other than the entity identified on **Schedule 8**, (the **"Broker"**) on account of services purported to have been rendered on behalf of the indemnifying party in connection with this Agreement or the transactions contemplated hereby and arising out of such party's actions. Anything in this Agreement to the contrary notwithstanding, each Subscriber is providing indemnification only for such Subscriber's own actions and not for any action of any other Subscriber. The Company agrees that it will pay the Broker the fee set forth on **Schedule 8** ("**Broker's Fees**"). The Company represents that there are no other parties entitled to receive fees, commissions, or similar payments in connection with the offering described in this Agreement except the Broker.

      (b)    Legal Fees. The Company shall pay to Grushko & Mittman, P.C., a cash fee of $25,000 ("**Legal Fees**") (of which $10,000 has been paid) as reimbursement for services rendered to the Subscribers in connection with this Agreement and the purchase and sale of the Notes and Warrants (the "**Offering**"). The Legal Fees and reimbursement for estimated UCC search fees, if any, (less any amounts paid prior to Closing) to be paid by the Company will be payable on the Closing Date out of funds held pursuant to the Escrow Agreement.

      9.    Covenants of the Company. The Company covenants and agrees with the Subscribers as follows:

      (a)    Stop Orders. The Company will advise the Subscribers, within two hours after the Company receives notice of issuance by the Commission, any state securities commission or any other regulatory authority of any stop order or of any order preventing or suspending any offering of any securities of the Company, or of the suspension of the qualification of the Common Stock of the Company for offering or sale in any jurisdiction, or the initiation of any proceeding for any such purpose.

      (b)    Listing. If applicable, the Company shall promptly secure the listing of the shares of Common Stock and the Warrant Shares upon each national securities exchange, or electronic or automated quotation system upon which they are or become eligible for listing and shall maintain such listing so long as any Notes or Warrants are outstanding. The Company will maintain the listing or quotation of its Common Stock on the American Stock Exchange, Nasdaq Capital Market, Nasdaq National Market System, Bulletin Board, or New York Stock Exchange (whichever of the foregoing is at the time the principal trading exchange or market for the Common Stock (the **"Principal Market"**)), and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Principal Market, as applicable. The Company will provide the Subscribers copies of all notices it receives notifying the Company of the threatened and actual delisting of the Common Stock from any Principal Market. As of the date of this Agreement, the Bulletin Board is the Principal Market.

      (c)    Market Regulations. If applicable, the Company shall notify the Commission, the Principal Market and applicable state authorities, in accordance with their requirements, of the transactions contemplated by this Agreement, and shall take all other necessary action and proceedings as may be required and permitted by applicable law, rule and regulation, for the legal and valid issuance of the Securities to the Subscribers and promptly provide copies thereof to Subscriber.

      (d)    Filing Requirements. From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company will (A) cause its Common Stock to continue to be registered under Section 12(b) or 12(g) of the 1934 Act, (B) comply in all respects with its reporting and filing obligations under the 1934 Act, (C) voluntarily comply with all reporting requirements that are applicable to an issuer with a class of shares registered pursuant to Section 12(g) of the 1934 Act, if Company is not subject to such reporting requirements, and (D) comply with all requirements related to any registration statement filed pursuant to this Agreement. The Company will use its best efforts not to

take any action or file any document (whether or not permitted by the 1933 Act or the 1934 Act or the rules thereunder) to terminate or suspend such registration or to terminate or suspend its reporting and filing obligations under said acts until two (2) years after the Closing Date. Until the earlier of the resale of the Shares and the Warrant Shares by each Subscriber or two (2) years after the Closing Date, the Company will use its best efforts to continue the listing or quotation of the Common Stock on a Principal Market and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Principal Market. The Company agrees to timely file a Form D with respect to the Securities if required under Regulation D and to provide a copy thereof to each Subscriber promptly after such filing.

(e)    Use of Proceeds. The proceeds of the Offering will be employed by the Company for the purposes set forth on **Schedule 9(e)** hereto. Except as set forth on **Schedule 9(e)**, the Purchase Price may not and will not be used for accrued and unpaid officer and director salaries, payment of financing related debt, redemption of outstanding notes or equity instruments of the Company, litigation related expenses or settlements, brokerage fees, nor non-trade obligations outstanding on a Closing Date. For so long as any Notes are outstanding, the Company will not prepay any financing related debt obligations, nor redeem any equity instruments of the Company.

(f)    Reservation. Prior to the Closing Date, the Company undertakes to reserve, pro rata, on behalf of the Subscribers from its authorized but unissued common stock, a number of common shares equal to 200% of the amount of Common Stock necessary to allow each Subscriber to be able to convert all Notes issuable pursuant to this Agreement and interest thereon and reserve 100% of the amount of Warrant Shares issuable upon exercise of the Warrants. Failure to have sufficient shares reserved pursuant to this Section 9(f) shall be a material default of the Company's obligations under this Agreement and an Event of Default under the Note.

(g)    Taxes. From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company will promptly pay and discharge, or cause to be paid and discharged, when due and payable, all lawful taxes, assessments and governmental charges or levies imposed upon the income, profits, property or business of the Company; provided, however, that any such tax, assessment, charge or levy need not be paid if the validity thereof shall currently be contested in good faith by appropriate proceedings and if the Company shall have set aside on its books adequate reserves with respect thereto, and provided, further, that the Company will pay all such taxes, assessments, charges or levies forthwith upon the commencement of proceedings to foreclose any lien which may have attached as security therefore.

(h)    Insurance. From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company will keep its assets which are of an insurable character insured by financially sound and reputable insurers against loss or damage by fire, explosion and other risks customarily insured against by companies in the Company's line of business, in amounts sufficient to prevent the Company from becoming a co-insurer and not in any event less than one hundred percent (100%) of the insurable value of the property insured less reasonable deductible amounts; and the Company will maintain, with financially sound and reputable insurers, insurance against other hazards and risks and liability to persons and property to the extent and in the manner customary for companies in similar businesses similarly situated and to the extent available on commercially reasonable terms.

(i)    Books and Records. From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144,

13

without regard to volume limitations, the Company will keep true records and books of account in which full, true and correct entries will be made of all dealings or transactions in relation to its business and affairs in accordance with generally accepted accounting principles applied on a consistent basis.

(j)     Governmental Authorities.   From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company shall duly observe and conform in all material respects to all valid requirements of governmental authorities relating to the conduct of its business or to its properties or assets.

(k)     Intellectual Property.   From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company shall maintain in full force and effect its corporate existence, rights and franchises and all licenses and other rights to use intellectual property owned or possessed by it and reasonably deemed to be necessary to the conduct of its business, unless it is sold for value.

(l)     Properties.   From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement (as defined in Section 11.1(ii) hereof) or pursuant to Rule 144, without regard to volume limitations, the Company will keep its properties in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all necessary and proper repairs, renewals, replacements, additions and improvements thereto; and the Company will at all times comply with each provision of all leases to which it is a party or under which it occupies property if the breach of such provision could reasonably be expected to have a Material Adverse Effect.

(m)     Confidentiality/Public Announcement.   From the date of this Agreement and until the sooner of (i) two (2) years after the Closing Date, or (ii) until all the Shares and Warrant Shares have been resold or transferred by all the Subscribers pursuant to the Registration Statement or pursuant to Rule 144, without regard to volume limitations, the Company agrees that except in connection with a Form 8-K or the Registration Statement or as otherwise required in any other Commission filing, it will not disclose publicly or privately the identity of the Subscribers unless expressly agreed to in writing by a Subscriber, only to the extent required by law and then only upon five days prior notice to Subscriber. In any event and subject to the foregoing, the Company shall file a Form 8-K or make a public announcement describing the Offering not later than the first business day after the Closing Date. In the Form 8-K or public announcement, the Company will specifically disclose the amount of common stock outstanding immediately after the Closing. A form of the proposed Form 8-K or public announcement to be employed in connection with the Closing is annexed hereto as **Exhibit E.**

(n)     Further Registration Statements.   Except for a registration statement filed on behalf of the Subscribers pursuant to Section 11 of this Agreement, and as set forth on **Schedule 11.1** hereto, the Company will not file any registration statements, including but not limited to Forms S-8, with the Commission or with state regulatory authorities without the consent of the Subscriber until the expiration of the **"Exclusion Period"**, which shall be defined as the sooner of (i) the Registration Statement shall have been current and available for use in connection with the resale of the Registrable Securities (as defined in Section 11.1(i) for a period of 180 days, or (ii) until all the Shares and Warrant Shares have been resold or transferred by the Subscribers pursuant to the Registration Statement or Rule 144(k) under the 1933 Act, without regard to volume limitations. The Exclusion Period will be tolled during the pendency of an Event of Default (as defined in the Note).

14

(o)    Blackout.    The Company undertakes and covenants that until the end of the Exclusion Period, the Company will not enter into any acquisition, merger, exchange or sale or other transaction that could have the effect of delaying the effectiveness of any pending registration statement or causing an already effective registration statement to no longer be effective or current.

(p)    Non-Public Information.    The Company covenants and agrees that neither it nor any other person acting on its behalf will provide any Subscriber or its agents or counsel with any information that the Company believes constitutes material non-public information, unless prior thereto such Subscriber shall have agreed in writing to receive such information. The Company understands and confirms that each Subscriber shall be relying on the foregoing representations in effecting transactions in securities of the Company. In any event, the Company will offer to the Subscriber an opportunity to review and comment on the Registration Statement thereto between three and five business days prior to the proposed filing date thereof.

(q)    Offering Restrictions.    Until the expiration of the Exclusion Period and during the pendency of an Event of Default, except for the Excepted Issuances, the Company will not enter into an agreement to nor issue any equity, convertible debt or other securities convertible into Common Stock or equity of the Company nor modify any of the foregoing which may be outstanding at anytime, without the prior written consent of the Subscriber, which consent may be withheld for any reason. For so long as at least twenty-five percent (25%) of the principal amount of the Notes is outstanding, the Company will not enter into any equity line of credit or similar agreement, nor issue nor agree to issue any floating or variable priced equity linked instruments nor any of the foregoing or equity with price reset rights.

(r)    Negative Covenants.    So long as at least twenty-five percent (25%) of the principal amount of the Notes issued on the Closing Date is outstanding and during the pendency of an Event of Default (as defined in the Note), without the consent of the Subscribers, the Company will not and will not permit any of its Subsidiaries to directly or indirectly:

(i)    create, incur, assume or suffer to exist any pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, security title, mortgage, security deed or deed of trust, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction) (each, a "**Lien**") upon any of its property, whether now owned or hereafter acquired except for (i) the Excepted Issuances (as defined in Section 12(a) hereof), (ii) (a) Liens imposed by law for taxes that are not yet due or are being contested in good faith and for which adequate reserves have been established in accordance with generally accepted accounting principles; (b) carriers', warehousemen's, mechanics', material men's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or that are being contested in good faith and by appropriate proceedings; (c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; (d) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business; (e) Liens created with respect to the financing of the purchase of new property in the ordinary course of the Company's business up to the amount of the purchase price of such property, or (f) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property (each of (a) through (f), a "**Permitted Lien**") and (iii) indebtedness for borrowed money which is not senior or pari passu in right of payment to the payment of the Notes;

15

(ii)    amend its certificate of incorporation, bylaws or its charter documents so as to adversely affect any rights of the Subscriber;

(iii)    repay, repurchase or offer to repay, repurchase or otherwise acquire or make any dividend or distribution in respect of any of its Common Stock, preferred stock, or other equity securities other than to the extent permitted or required under the Transaction Documents; or

(iv)    engage in any transactions with any officer, director, employee or any Affiliate of the Company, including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner, in each case in excess of $10,000 other than (i) for payment of salary or consulting fees for services rendered, (ii) reimbursement for expenses incurred on behalf of the Company, (iii) for other employee benefits, including stock option agreements under any stock option plan of the Company, and (iv) for mineral rights, or interest previously owned by officers, directors, or employees of the Company as described in **Schedule 9(r)**.

(s)    Limited Standstill.    The Company will deliver to the Subscribers on or before the Closing Date and enforce the provisions of irrevocable standstill agreements ("**Limited Standstill Agreements**") in the form annexed hereto as **Exhibit F**, with the parties identified on **Schedule 9(s)** hereto, who comprise all owners beneficially or otherwise, of 2.5% or more of the Company's Common Stock and options or rights to acquire Common Stock.

10.    Covenants of the Company and Subscriber Regarding Indemnification.

(a)    The Company agrees to indemnify, hold harmless, reimburse and defend the Subscribers, the Subscribers' officers, directors, agents, Affiliates, control persons, and principal shareholders, against any claim, cost, expense, liability, obligation, loss or damage (including reasonable legal fees) of any nature, incurred by or imposed upon the Subscriber or any such person which results, arises out of or is based upon (i) any material misrepresentation by Company or material breach of any warranty by Company in this Agreement or in any Exhibits or Schedules attached hereto, or other agreement delivered pursuant hereto; or (ii) after any applicable notice and/or cure periods, any material breach or default in performance by the Company of any covenant or undertaking to be performed by the Company hereunder, or any other agreement entered into by the Company and Subscriber relating hereto.

(b)    Each Subscriber agrees to indemnify, hold harmless, reimburse and defend the Company and each of the Company's officers, directors, agents, Affiliates, control persons against any claim, cost, expense, liability, obligation, loss or damage (including reasonable legal fees) of any nature, incurred by or imposed upon the Company or any such person which results, arises out of or is based upon (i) any material misrepresentation by such Subscriber in this Agreement or in any Exhibits or Schedules attached hereto, or other agreement delivered pursuant hereto; or (ii) after any applicable notice and/or cure periods, any material breach or default in performance by such Subscriber of any covenant or undertaking to be performed by such Subscriber hereunder, or any other agreement entered into by the Company and Subscribers, relating hereto.

(c)    In no event shall the liability of any Subscriber or permitted successor hereunder or under any Transaction Document or other agreement delivered in connection herewith be greater in amount than the dollar amount of the net proceeds actually received by such Subscriber upon the sale of Registrable Securities (as defined herein).

(d)    The procedures set forth in Section 11.6 shall apply to the indemnification set forth in Sections 10(a) and 10(b) above.

16

11.1.    Registration Rights.  The Company hereby grants the following registration rights to holders of the Securities.

(i)    On one occasion, for a period commencing one hundred and twenty-one (121) days after the Closing Date, but not later than two (2) years after the Closing Date, upon a written request therefor from any record holder or holders of more than 50% of the Shares issued and issuable upon conversion of the outstanding Notes and outstanding Warrant Shares, the Company shall prepare and file with the Commission a registration statement under the 1933 Act registering the Registrable Securities, as defined in Section 11.1(iv) hereof, which are the subject of such request for unrestricted public resale by the holder thereof. For purposes of Sections 11.1(i) and 11.1(ii), Registrable Securities shall not include Securities which are (A) registered for resale in an effective registration statement, (B) included for registration in a pending registration statement, or (C) which have been issued without further transfer restrictions after a sale or transfer pursuant to Rule 144 under the 1933 Act. Upon the receipt of such request, the Company shall promptly give written notice to all other record holders of the Registrable Securities that such registration statement is to be filed and shall include in such registration statement Registrable Securities for which it has received written requests within ten (10) days after the Company gives such written notice. Such other requesting record holders shall be deemed to have exercised their demand registration right under this Section 11.1(i).

(ii)    If the Company at any time proposes to register any of its securities under the 1933 Act for sale to the public, whether for its own account or for the account of other security holders or both, except with respect to registration statements on Forms S-4, S-8 or another form not available for registering the Registrable Securities for sale to the public, provided the Registrable Securities are not otherwise registered for resale by the Subscribers or Holder pursuant to an effective registration statement, each such time it will give at least fifteen (15) days' prior written notice to the record holder of the Registrable Securities of its intention so to do. Upon the written request of the holder, received by the Company within ten (10) days after the giving of any such notice by the Company, to register any of the Registrable Securities not previously registered, the Company will cause such Registrable Securities as to which registration shall have been so requested to be included with the securities to be covered by the registration statement proposed to be filed by the Company, all to the extent required to permit the sale or other disposition of the Registrable Securities so registered by the holder of such Registrable Securities (the "Seller" or "Sellers"). In the event that any registration pursuant to this Section 11.1(ii) shall be, in whole or in part, an underwritten public offering of common stock of the Company, the number of shares of Registrable Securities to be included in such an underwriting may be reduced by the managing underwriter if and to the extent that the Company and the underwriter shall reasonably be of the opinion that such inclusion would adversely affect the marketing of the securities to be sold by the Company therein; provided, however, that the Company shall notify the Seller in writing of any such reduction. Notwithstanding the foregoing provisions, or Section 11.4 hereof, the Company may withdraw or delay or suffer a delay of any registration statement referred to in this Section 11.1(ii) without thereby incurring any liability to the Seller.

(iii)    If, at the time any written request for registration is received by the Company pursuant to Section 11.1(i), the Company has determined to proceed with the actual preparation and filing of a registration statement under the 1933 Act in connection with the proposed offer and sale for cash of any of its securities for the Company's own account and the Company actually does file such other registration statement, such written request shall be deemed to have been given pursuant to Section 11.1(ii) rather than Section 11.1(i), and the rights of the holders of Registrable Securities covered by such written request shall be governed by Section 11.1(ii).

(iv)    The Company shall file with the Commission a Form SB-2 registration statement (the "Registration Statement") (or such other form that it is eligible to use) in order to register the Registrable Securities for resale and distribution under the 1933 Act within thirty (30) calendar days after the Closing Date (the "Filing Date"), and cause to be declared effective not later than one hundred

17

and twenty (120) calendar days after the Closing Date (the **"Effective Date"**). The Company will register not less than a number of shares of common stock in the aforedescribed registration statement that is equal to 200% of the Shares issuable upon conversion of all of the Notes issuable to the Subscribers, and 100% of the Warrant Shares issuable pursuant to this Agreement upon exercise of the Warrants (collectively the **"Registrable Securities"**). The Registrable Securities shall be reserved and set aside exclusively for the benefit of each Subscriber and Warrant holder, pro rata, and not issued, employed or reserved for anyone other than each such Subscriber and Warrant holder. The Registration Statement will immediately be amended or additional registration statements will be immediately filed by the Company as necessary to register additional shares of Common Stock to allow the public resale of all Common Stock included in and issuable by virtue of the Registrable Securities. Except with the written consent of the Subscriber, no securities of the Company other than the Registrable Securities will be included in the Registration Statement. It shall be deemed a Non-Registration Event if at any time after the date the Registration Statement is declared effective by the Commission (**"Actual Effective Date"**) the Company has registered for unrestricted resale on behalf of the Subscribers fewer than 125% of the amount of Common Shares issuable upon full conversion of all sums due under the Notes and 100% of the Warrant Shares issuable upon exercise of the Warrants.

11.2.    Registration Procedures. If and whenever the Company is required by the provisions of Section 11.1(i) or 11.1(ii) to effect the registration of any Registrable Securities under the 1933 Act, the Company will, as expeditiously as possible:

(a)    subject to the timelines provided in this Agreement, prepare and file with the Commission a registration statement required by Section 11, with respect to such securities and use its best efforts to cause such registration statement to become and remain effective for the period of the distribution contemplated thereby (determined as herein provided), promptly provide to the holders of the Registrable Securities copies of all filings and Commission letters of comment and notify Subscribers (by telecopier and by e-mail addresses provided by Subscribers) and Grushko & Mittman, P.C. (by telecopier and by email to Counslers@aol.com) on or before the first business day thereafter that the Company receives notice that (i) the Commission has no comments or no further comments on the Registration Statement, and (ii) the registration statement has been declared effective (failure to timely provide notice as required by this Section 11.2(a) shall be a material breach of the Company's obligation and an Event of Default as defined in the Notes and a Non-Registration Event as defined in Section 11.4 of this Agreement);

(b)    prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection therewith as may be necessary to keep such registration statement effective until such registration statement has been effective for a period of two (2) years, and comply with the provisions of the 1933 Act with respect to the disposition of all of the Registrable Securities covered by such registration statement in accordance with the Sellers' intended method of disposition set forth in such registration statement for such period;

(c)    furnish to the Sellers, at the Company's expense, such number of copies of the registration statement and the prospectus included therein (including each preliminary prospectus) as such persons reasonably may request in order to facilitate the public sale or their disposition of the securities covered by such registration statement or make them electronically available;

(d)    use its commercially reasonable best efforts to register or qualify the Registrable Securities covered by such registration statement under the securities or "blue sky" laws of New York and such jurisdictions as the Sellers shall request in writing, provided, however, that the Company shall not for any such purpose be required to qualify generally to transact business as a foreign corporation in any jurisdiction where it is not so qualified or to consent to general service of process in any such jurisdiction;

18

        (e)    if applicable, list the Registrable Securities covered by such registration statement with any securities exchange on which the Common Stock of the Company is then listed;

        (f)    notify the Subscribers within two hours of the Company's becoming aware that a prospectus relating thereto is required to be delivered under the 1933 Act, of the happening of any event of which the Company has knowledge as a result of which the prospectus contained in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing or which becomes subject to a Commission, state or other governmental order suspending the effectiveness of the registration statement covering any of the Registrable Securities;

        (g)    provided same would not be in violation of the provision of Regulation FD under the 1934 Act, make available for inspection by the Sellers, and any attorney, accountant or other agent retained by the Seller or underwriter, all publicly available, non-confidential financial and other records, pertinent corporate documents and properties of the Company, and cause the Company's officers, directors and employees to supply all publicly available, non-confidential information reasonably requested by the seller, attorney, accountant or agent in connection with such registration statement; and

        (h)    provide to the Sellers copies of the Registration Statement and amendments thereto five business days prior to the filing thereof with the Commission.

        11.3.    Provision of Documents. In connection with each registration described in this Section 11, each Seller will furnish to the Company in writing such information and representation letters with respect to itself and the proposed distribution by it as reasonably shall be necessary in order to assure compliance with federal and applicable state securities laws.

        11.4.    Non-Registration Events. The Company and the Subscribers agree that the Sellers will suffer damages if the Registration Statement is not filed by the Filing Date and not declared effective by the Commission by the Effective Date, and any registration statement required under Section 11.1(i) or 11.1(ii) is not filed within 60 days after written request and declared effective by the Commission within 120 days after such request, and maintained in the manner and within the time periods contemplated by Section 11 hereof, and it would not be feasible to ascertain the extent of such damages with precision. Accordingly, if (A) the Registration Statement is not filed on or before the Filing Date, (B) is not declared effective on or before the Effective Date, (C) due to the action or inaction of the Company the Registration Statement is not declared effective within three (3) business days after receipt by the Company or its attorneys of a written or oral communication from the Commission that the Registration Statement will not be reviewed or that the Commission has no further comments, (D) if the registration statement described in Sections 11.1(i) or 11.1(ii) is not filed within 60 days after such written request, or is not declared effective within 120 days after such written request, or (E) any registration statement described in Sections 11.1(i), 11.1(ii) or 11.1(iv) is filed and declared effective but shall thereafter cease to be effective without being succeeded within fifteen (15) business days by an effective replacement or amended registration statement or for a period of time which shall exceed thirty (30) days in the aggregate per year (defined as every rolling period of 365 consecutive days commencing on the Actual Effective Date (each such event referred to in clauses A through E of this Section 11.4 is referred to herein as a **"Non-Registration Event"),** then the Company shall deliver to the holder of Registrable Securities, as **Liquidated Damages,** an amount equal to one percent (1%) for each thirty (30) days (or such lesser pro-rata amount for any period of less than thirty (30) days) of the Purchase Price of the outstanding Notes and purchase price of Shares issued upon conversion of the Notes owned of record by such holder which are subject to such Non-Registration Event. The Company must pay the Liquidated Damages in cash. The Liquidated Damages must be paid within ten (10) days after the end of each thirty (30) day period or shorter part thereof for which Liquidated Damages are payable. In the event a Registration Statement is filed by the Filing Date but is withdrawn prior to being declared effective by the Commission, then such Registration Statement will be deemed to

19

have not been filed and Liquidated Damages will be calculated accordingly. All oral or written comments received from the Commission relating to the Registration Statement must be satisfactorily responded to within ten (10) business days after receipt of comments from the Commission. Failure to timely respond to Commission comments is a Non-Registration Event for which Liquidated Damages shall accrue and be payable by the Company to the holders of Registrable Securities at the same rate set forth above. Notwithstanding the foregoing, the Company shall not be liable to the Subscriber under this Section 11.4 for any events or delays occurring as a consequence of the acts or omissions of the Subscribers contrary to the obligations undertaken by Subscribers in this Agreement. Liquidated Damages will not accrue nor be payable pursuant to this Section 11.4 nor will a Non-Registration Event be deemed to have occurred for times during which Registrable Securities are transferable by the holder of Registrable Securities pursuant to Rule 144(k) under the 1933 Act.

   11.5.   Expenses. All expenses incurred by the Company in complying with Section 11, including, without limitation, all registration and filing fees, printing expenses (if required), fees and disbursements of counsel and independent public accountants for the Company, fees and expenses (including reasonable counsel fees) incurred in connection with complying with state securities or "blue sky" laws, fees of the National Association of Securities Dealers, Inc., transfer taxes, and fees of transfer agents and registrars, are called "**Registration Expenses**." All underwriting discounts and selling commissions applicable to the sale of Registrable Securities are called "**Selling Expenses**." The Company will pay all Registration Expenses in connection with the registration statement under Section 11. Selling Expenses in connection with each registration statement under Section 11 shall be borne by the Seller and may be apportioned among the Sellers in proportion to the number of shares sold by the Seller relative to the number of shares sold under such registration statement or as all Sellers thereunder may agree.

   11.6.   Indemnification and Contribution.

         (a)   In the event of a registration of any Registrable Securities under the 1933 Act pursuant to Section 11, the Company will, to the extent permitted by law, indemnify and hold harmless the Seller, each officer of the Seller, each director of the Seller, each underwriter of such Registrable Securities thereunder and each other person, if any, who controls such Seller or underwriter within the meaning of the 1933 Act, against any losses, claims, damages or liabilities, joint or several, to which the Seller, or such underwriter or controlling person may become subject under the 1933 Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in any registration statement under which such Registrable Securities was registered under the 1933 Act pursuant to Section 11, any preliminary prospectus or final prospectus contained therein, or any amendment or supplement thereof, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances when made, and will subject to the provisions of Section 11.6(c) reimburse the Seller, each such underwriter and each such controlling person for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that the Company shall not be liable to the Seller to the extent that any such damages arise out of or are based upon an untrue statement or omission made in any preliminary prospectus if (i) the Seller failed to send or deliver a copy of the final prospectus delivered by the Company to the Seller with or prior to the delivery of written confirmation of the sale by the Seller to the person asserting the claim from which such damages arise, (ii) the final prospectus would have corrected such untrue statement or alleged untrue statement or such omission or alleged omission, or (iii) to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission so made in conformity with information furnished by any such Seller, or any such controlling person in writing specifically for use in such registration statement or prospectus.

         (b)   In the event of a registration of any of the Registrable Securities under the 1933 Act pursuant to Section 11, each Seller severally but not jointly will, to the extent permitted by law,

indemnify and hold harmless the Company, and each person, if any, who controls the Company within the meaning of the 1933 Act, each officer of the Company who signs the registration statement, each director of the Company, each underwriter and each person who controls any underwriter within the meaning of the 1933 Act, against all losses, claims, damages or liabilities, joint or several, to which the Company or such officer, director, underwriter or controlling person may become subject under the 1933 Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the registration statement under which such Registrable Securities were registered under the 1933 Act pursuant to Section 11, any preliminary prospectus or final prospectus contained therein, or any amendment or supplement thereof, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse the Company and each such officer, director, underwriter and controlling person for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action, provided, however, that the Seller will be liable hereunder in any such case if and only to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in reliance upon and in conformity with information pertaining to such Seller, as such, furnished in writing to the Company by such Seller specifically for use in such registration statement or prospectus, and provided, further, however, that the liability of the Seller hereunder shall be limited to the net proceeds actually received by the Seller from the sale of Registrable Securities covered by such registration statement.

(c)    Promptly after receipt by an indemnified party hereunder of notice of the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party hereunder, notify the indemnifying party in writing thereof, but the omission so to notify the indemnifying party shall not relieve it from any liability which it may have to such indemnified party other than under this Section 11.6(c) and shall only relieve it from any liability which it may have to such indemnified party under this Section 11.6(c), except and only if and to the extent the indemnifying party is prejudiced by such omission. In case any such action shall be brought against any indemnified party and it shall notify the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate in and, to the extent it shall wish, to assume and undertake the defense thereof with counsel satisfactory to such indemnified party, and, after notice from the indemnifying party to such indemnified party of its election so to assume and undertake the defense thereof, the indemnifying party shall not be liable to such indemnified party under this Section 11.6(c) for any legal expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation and of liaison with counsel so selected, provided, however, that, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be reasonable defenses available to it which are different from or additional to those available to the indemnifying party or if the interests of the indemnified party reasonably may be deemed to conflict with the interests of the indemnifying party, the indemnified parties, as a group, shall have the right to select one separate counsel and to assume such legal defenses and otherwise to participate in the defense of such action, with the reasonable expenses and fees of such separate counsel and other expenses related to such participation to be reimbursed by the indemnifying party as incurred.

(d)    In order to provide for just and equitable contribution in the event of joint liability under the 1933 Act in any case in which either (i) a Seller, or any controlling person of a Seller, makes a claim for indemnification pursuant to this Section 11.6 but it is judicially determined (by the entry of a final judgment or decree by a court of competent jurisdiction and the expiration of time to appeal or the denial of the last right of appeal) that such indemnification may not be enforced in such case notwithstanding the fact that this Section 11.6 provides for indemnification in such case, or (ii) contribution under the 1933 Act may be required on the part of the Seller or controlling person of the Seller in circumstances for which indemnification is not provided under this Section 11.6; then, and in each such case, the Company and the Seller will contribute to the aggregate losses, claims, damages or

21

liabilities to which they may be subject (after contribution from others) in such proportion so that the Seller is responsible only for the portion represented by the percentage that the public offering price of its securities offered by the registration statement bears to the public offering price of all securities offered by such registration statement, provided, however, that, in any such case, (y) the Seller will not be required to contribute any amount in excess of the public offering price of all such securities sold by it pursuant to such registration statement; and (z) no person or entity guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the 1933 Act) will be entitled to contribution from any person or entity who was not guilty of such fraudulent misrepresentation.

### 11.7.   Delivery of Unlegended Shares.

(a)     Within four (4) business days (such fourth business day being the "**Unlegended Shares Delivery Date**") after the business day on which the Company has received (i) a notice that Shares or Warrant Shares or any other Common Stock held by a Subscriber have been sold pursuant to the Registration Statement or Rule 144 under the 1933 Act, (ii) a representation that the prospectus delivery requirements, or the requirements of Rule 144, as applicable and if required, have been satisfied, and (iii) the original share certificates representing the shares of Common Stock that have been sold, and (iv) in the case of sales under Rule 144, customary representation letters of the Subscriber and/or Subscriber's broker regarding compliance with the requirements of Rule 144, the Company at its expense, (y) shall deliver, and shall cause legal counsel selected by the Company to deliver to its transfer agent (with copies to Subscriber) an appropriate instruction and opinion of such counsel, directing the delivery of shares of Common Stock without any legends including the legend set forth in Section 4(i) above, reissuable pursuant to any effective and current Registration Statement described in Section 11 of this Agreement or pursuant to Rule 144 under the 1933 Act (the "**Unlegended Shares**"); and (z) cause the transmission of the certificates representing the Unlegended Shares together with a legended certificate representing the balance of the submitted Shares certificate, if any, to the Subscriber at the address specified in the notice of sale, via express courier, by electronic transfer or otherwise on or before the Unlegended Shares Delivery Date.

(b)     In lieu of delivering physical certificates representing the Unlegended Shares, if the Company's transfer agent is participating in the Depository Trust Company ("**DTC**") Fast Automated Securities Transfer program, upon request of a Subscriber, so long as the certificates therefor do not bear a legend and the Subscriber is not obligated to return such certificate for the placement of a legend thereon, the Company shall cause its transfer agent to electronically transmit the Unlegended Shares by crediting the account of Subscriber's prime Broker with DTC through its Deposit Withdrawal Agent Commission system.  Such delivery must be made on or before the Unlegended Shares Delivery Date.

(c)     The Company understands that a delay in the delivery of the Unlegended Shares pursuant to Section 11 hereof later than two business days after the Unlegended Shares Delivery Date could result in economic loss to a Subscriber.  As compensation to a Subscriber for such loss, the Company agrees to pay late payment fees (as liquidated damages and not as a penalty) to the Subscriber for late delivery of Unlegended Shares in the amount of $100 per business day after the Delivery Date for each $10,000 of purchase price of the Unlegended Shares subject to the delivery default.  If during any 360 day period, the Company fails to deliver Unlegended Shares as required by this Section 11.7 for an aggregate of thirty (30) days, then each Subscriber or assignee holding Securities subject to such default may, at its option, require the Company to redeem all or any portion of the Shares and Warrant Shares subject to such default at a price per share equal to the greater of (i) 120%, or (ii) a fraction in which the numerator is the highest closing price during the aforedescribed thirty day period and the denominator of which is the lowest conversion price during such thirty day period, multiplied by the Purchase Price of such Common Stock and Warrant Shares ("**Unlegended Redemption Amount**").  The amount of the aforedescribed liquidated damages that have accrued or been paid for the ten day period prior to the receipt by the Subscriber of the Unlegended Redemption Amount shall be credited against the Unlegended Redemption

Amount. The Company shall pay any payments incurred under this Section in immediately available funds upon demand.

           (d)    In addition to any other rights available to a Subscriber, if the Company fails to deliver to a Subscriber Unlegended Shares as required pursuant to this Agreement, within six (6) business days after the Unlegended Shares Delivery Date and the Subscriber or a broker on the Subscriber's behalf, purchases (in an open market transaction or otherwise) shares of common stock to deliver in satisfaction of a sale by such Subscriber of the shares of Common Stock which the Subscriber was entitled to receive from the Company (a "**Buy-In**"), then the Company shall pay in cash to the Subscriber (in addition to any remedies available to or elected by the Subscriber) the amount by which (A) the Subscriber's total purchase price (including brokerage commissions, if any) for the shares of common stock so purchased exceeds (B) the aggregate purchase price of the shares of Common Stock delivered to the Company for reissuance as Unlegended Shares- together with interest thereon at a rate of 15% per annum, accruing until such amount and any accrued interest thereon is paid in full (which amount shall be paid as liquidated damages and not as a penalty). For example, if a Subscriber purchases shares of Common Stock having a total purchase price of $11,000 to cover a Buy-In with respect to $10,000 of purchase price of shares of Common Stock delivered to the Company for reissuance as Unlegended Shares, the Company shall be required to pay the Subscriber $1,000, plus interest. The Subscriber shall provide the Company written notice indicating the amounts payable to the Subscriber in respect of the Buy-In.

           (e)    In the event a Subscriber shall request delivery of Unlegended Shares as described in Section 11.7 and the Company is required to deliver such Unlegended Shares pursuant to Section 11.7, the Company may not refuse to deliver Unlegended Shares based on any claim that such Subscriber or any one associated or affiliated with such Subscriber has been engaged in any violation of law, or for any other reason, unless, an injunction or temporary restraining order from a court, on notice, restraining and or enjoining delivery of such Unlegended Shares or exercise of all or part of said Warrant shall have been sought and obtained by the Company or at the Company's request or with the Company's assistance, and the Company has posted a surety bond for the benefit of such Subscriber in the amount of 120% of the amount of the aggregate purchase price of the Common Stock and Warrant Shares which are subject to the injunction or temporary restraining order, which bond shall remain in effect until the completion of arbitration/litigation of the dispute and the proceeds of which shall be payable to such Subscriber to the extent Subscriber obtains judgment in Subscriber's favor.

           12.    (a)    <u>Right of First Refusal</u>.  Until one year after the Closing Date, the Subscribers shall be given not less than seven (7) business days prior written notice of any proposed sale by the Company of its common stock or other securities or debt obligations, except in connection with (i) full or partial consideration in connection with a strategic merger, acquisition, consolidation or purchase of substantially all of the securities or assets of corporation or other entity which holders of such securities or debt are not at any time granted registration rights, (ii) the Company's issuance of securities in connection with strategic license agreements and other partnering arrangements so long as such issuances are not for the purpose of raising capital which holders of such securities or debt are not at any time granted registration rights, (iii) the Company's issuance of Common Stock or the issuances or grants of options to purchase Common Stock pursuant to stock option plans and employee stock purchase plans described on **Schedule 5(d)** hereto at prices equal to or higher than the closing price of the Common Stock on the issue date of any of the foregoing, (iv) as a result of the exercise of Warrants or conversion of Notes which are granted or issued pursuant to this Agreement or that have been issued prior to the Closing Date, the issuance of which has been disclosed in a Report filed not less than five (5) days prior to the Closing Date, (v) the payment of any interest on the Notes and liquidated damages or other damages pursuant to the Transaction Documents or other securities instruments that have been issued prior to the Closing Date, the issuance of which has been disclosed in a Report filed not less than five days prior to the Closing Date, and (vi) as described on **Schedule 12(a)** (collectively the foregoing are "**Excepted Issuances**"). The Subscribers who exercise their rights pursuant to this Section 12(a) shall have the right during the seven (7) business days following receipt of the notice to purchase such offered common stock, debt or other

23

securities in accordance with the terms and conditions set forth in the notice of sale in the same proportion to each other as their purchase of Notes in the Offering. In the event such terms and conditions are modified during the notice period, the Subscribers shall be given prompt notice of such modification and shall have the right during the seven (7) business days following the notice of modification to exercise such right.

(b)    Favored Nations Provision.    Other than in connection with the Excepted Issuances, if at any time Notes or Warrants are outstanding, and as limited in connection with the Warrants and Warrants Shares to the time periods set forth in Section 3.4 of the Warrant, the Company shall offer, issue or agree to issue any common stock or securities convertible into or exercisable for shares of common stock (or modify any of the foregoing which may be outstanding) to any person or entity at a price per share or conversion or exercise price per share which shall be less than the Conversion Price in respect of the Shares, or if less than the Warrant exercise price in respect of the Warrant Shares, without the consent of each Subscriber holding Notes, Shares, Warrants, or Warrant Shares, then the Company shall issue, for each such occasion, additional shares of Common Stock to each Subscriber so that the average per share purchase price of the shares of Common Stock issued to the Subscriber (of only the Common Stock or Warrant Shares still owned by the Subscriber) is equal to such other lower price per share and the Conversion Price and Warrant exercise price shall automatically be reduced to such other lower price. The average Purchase Price of the Shares and average exercise price in relation to the Warrant Shares shall be calculated separately for the Shares and Warrant Shares. The foregoing calculation and issuance shall be made separately for Shares received upon conversion and separately for Warrant Shares. The delivery to the Subscriber of the additional shares of Common Stock shall be not later than the closing date of the transaction giving rise to the requirement to issue additional shares of Common Stock. The Subscriber is granted the registration rights described in Section 11 hereof in relation to such additional shares of Common Stock except that the Filing Date and Effective Date vis-à-vis such additional common shares shall be, respectively, the thirtieth (30th) and sixtieth (60th) date after the closing date giving rise to the requirement to issue the additional shares of Common Stock. For purposes of the issuance and adjustment described in this paragraph, the issuance of any security of the Company carrying the right to convert such security into shares of Common Stock or of any warrant, right or option to purchase Common Stock shall result in the issuance of the additional shares of Common Stock upon the sooner of the agreement to or actual issuance of such convertible security, warrant, right or option and again at any time upon any subsequent issuances of shares of Common Stock upon exercise of such conversion or purchase rights if such issuance is at a price lower than the Conversion Price or Warrant exercise price in effect upon such issuance. The rights of the Subscriber set forth in this Section 12 are in addition to any other rights the Subscriber has pursuant to this Agreement, the Note, any Transaction Document, and any other agreement referred to or entered into in connection herewith. The Subscriber is also given the right to elect to substitute any term or terms of any other offering in connection with which the Subscriber has rights as described in Section 12(a), for any term or terms of the Offering in connection with Securities owned by Subscriber as of the date the notice described in Section 12(a) is required to be given to Subscriber.

(c)    Maximum Exercise of Rights.    In the event the exercise of the rights described in Sections 12(a) and 12(b) would or could result in the issuance of an amount of common stock of the Company that would exceed the maximum amount that may be issued to a Subscriber calculated in the manner described in Section 7.3 of this Agreement, then the issuance of such additional shares of common stock of the Company to such Subscriber will be deferred in whole or in part until such time as such Subscriber is able to beneficially own such common stock without exceeding the applicable maximum amount set forth calculated in the manner described in Section 7.3 of this Agreement. The determination of when such common stock may be issued shall be made by each Subscriber as to only such Subscriber.

24

13.    Miscellaneous.

(a)    Notices. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be: (i) if to the Company, to: Ness Energy International, Inc., 4201 East Interstate 20, Willow Park, TX 76087, Attn: JF Hoover, CFO, telecopier: (817) 597-4303, with a copy by telecopier only to: Kevin Woltjen, Woltjen Law Firm, 4144 North Central Expressway, Suite 410, Dallas, TX 75204, telecopier: (214) 742-5545, (ii) if to the Subscriber, to: the one or more addresses and telecopier numbers indicated on the signature pages hereto, with an additional copy by telecopier only to: Grushko & Mittman, P.C., 551 Fifth Avenue, Suite 1601, New York, New York 10176, telecopier number: (212) 697-3575, and (iii) if to the Broker, to: the address and telecopier number set forth on **Schedule 8** hereto.

(b)    Entire Agreement; Assignment. This Agreement and other documents delivered in connection herewith represent the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by both parties. Neither the Company nor the Subscribers have relied on any representations not contained or referred to in this Agreement and the documents delivered herewith. No right or obligation of the Company shall be assigned without prior notice to and the written consent of the Subscribers.

(c)    Counterparts/Execution. This Agreement may be executed in any number of counterparts and by the different signatories hereto on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute but one and the same instrument. This Agreement may be executed by facsimile signature and delivered by facsimile transmission.

(d)    Law Governing this Agreement. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles that would result in the application of the substantive laws of another jurisdiction. Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the civil or state courts of New York or in the federal courts located in New York County. **The parties and the individuals executing this Agreement and other agreements referred to herein or delivered in connection herewith on behalf of the Company agree to submit to the jurisdiction of such courts and waive trial by jury.** The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. In the event that any provision of this Agreement or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement.

(e)    Specific Enforcement, Consent to Jurisdiction. To the extent permitted by law, the Company and Subscriber acknowledge and agree that irreparable damage would occur in the

25

event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to one or more preliminary and final injunctions to prevent or cure breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which any of them may be entitled by law or equity. Subject to Section 13(d) hereof, each of the Company, Subscriber and any signator hereto in his personal capacity hereby waives, and agrees not to assert in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction in New York of such court, that the suit, action or proceeding is brought in an inconvenient forum or that the venue of the suit, action or proceeding is improper. Nothing in this Section shall affect or limit any right to serve process in any other manner permitted by law.

(f)    Damages.    In the event the Subscriber is entitled to receive any liquidated damages pursuant to the Transactions, the Subscriber may elect to receive the greater of actual damages or such liquidated damages.

(g)    Independent Nature of Subscribers.    The Company acknowledges that the obligations of each Subscriber under the Transaction Documents are several and not joint with the obligations of any other Subscriber, and no Subscriber shall be responsible in any way for the performance of the obligations of any other Subscriber under the Transaction Documents. The Company acknowledges that each Subscriber has represented that the decision of each Subscriber to purchase Securities has been made by such Subscriber independently of any other Subscriber and independently of any information, materials, statements or opinions as to the business, affairs, operations, assets, properties, liabilities, results of operations, condition (financial or otherwise) or prospects of the Company which may have been made or given by any other Subscriber or by any agent or employee of any other Subscriber, and no Subscriber or any of its agents or employees shall have any liability to any Subscriber (or any other person) relating to or arising from any such information, materials, statements or opinions. The Company acknowledges that nothing contained in any Transaction Document, and no action taken by any Subscriber pursuant hereto or thereto (including, but not limited to, the (i) inclusion of a Subscriber in the Registration Statement and (ii) review by, and consent to, such Registration Statement by a Subscriber) shall be deemed to constitute the Subscribers as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Subscribers are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by the Transaction Documents. The Company acknowledges that each Subscriber shall be entitled to independently protect and enforce its rights, including without limitation, the rights arising out of the Transaction Documents, and it shall not be necessary for any other Subscriber to be joined as an additional party in any proceeding for such purpose. The Company acknowledges that it has elected to provide all Subscribers with the same terms and Transaction Documents for the convenience of the Company and not because Company was required or requested to do so by the Subscribers. The Company acknowledges that such procedure with respect to the Transaction Documents in no way creates a presumption that the Subscribers are in any way acting in concert or as a group with respect to the Transaction Documents or the transactions contemplated thereby.

(h)    Consent.    As used in the Agreement, "consent of the Subscribers" or similar language means the consent of holders of not less than 75% of the total of the Shares issued and issuable upon conversion of outstanding Notes owned by Subscribers on the date consent is requested.

(i)    Equal Treatment.    No consideration shall be offered or paid to any person to amend or consent to a waiver or modification of any provision of the Transaction Documents unless the same consideration is also offered and paid to all the parties to the Transaction Documents.

## SIGNATURE PAGE TO SUBSCRIPTION AGREEMENT (A)

Please acknowledge your acceptance of the foregoing Subscription Agreement by signing and returning a copy to the undersigned whereupon it shall become a binding agreement between us.

NESS ENERGY INTERNATIONAL, INC.
a Washington corporation

By: _____
Name: _____
Title: _____

Dated: May ____, 2006

| SUBSCRIBER | NOTE PRINCIPAL AMOUNT | PURCHASE PRICE | CLASS A WARRANTS |
|---|---|---|---|
| ALPHA CAPITAL AKTIENGESELLSCHAFT Pradafant 7 9490 Furstentums Vaduz, Lichtenstein Fax: 011-42-32323196 | $454,545.46 | $400,000 | 2,932.55 |
| _____ (Signature) By: | | | |

## SIGNATURE PAGE TO SUBSCRIPTION AGREEMENT (A)

Please acknowledge your acceptance of the foregoing Subscription Agreement by signing and returning a copy to the undersigned whereupon it shall become a binding agreement between us.

NESS ENERGY INTERNATIONAL, INC.
a Washington corporation

By:_____
     Name:
     Title:

Dated: May 31, 2006

| SUBSCRIBER | NOTE PRINCIPAL AMOUNT | PURCHASE PRICE | CLASS A WARRANTS |
|---|---|---|---|
| ALPHA CAPITAL AKTIENGESELLSCHAFT Pradafant 7 9490 Forstentums Vaduz, Lichtenstein Fax: 011-42-32323196 (Signature) By Vowrad Ackermann | $454,545.46 | $400,000 | 2,932,551 |

27

## LIST OF EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A | Form of Note |
| Exhibit B | Form of Warrant |
| Exhibit C | Escrow Agreement |
| Exhibit D | Form of Legal Opinion |
| Exhibit E | Form of Form 8-K or Public Announcement |
| Exhibit F | Limited Standstill Agreement |
| Schedule 5(a) | Subsidiaries |
| Schedule 5(d) | Additional Issuances / Capitalization |
| Schedule 5(q) | Undisclosed Liabilities |
| Schedule 5(v) | Transfer Agent |
| Schedule 8 | Broker |
| Schedule 9(e) | Use of Proceeds |
| Schedule 9(r) | Officer and Director Mineral Rights |
| Schedule 9(s) | Limited Standstill Providers |
| Schedule 12(a) | Other Excepted Issuances |

**EXHIBIT F**

**LIMITED STANDSTILL AGREEMENT**

This AGREEMENT (the "Agreement") is made as of the /7ᵗʰ day of May, 2006, by the signatories hereto (each a "Holder"), in connection with his ownership of shares of Ness Energy International, Inc., a Washington corporation (the "Company").

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which consideration are hereby acknowledged, Holder agrees as follows:

1.    **Background.**

a.    Holder is the beneficial owner of the amount of shares of the Common Stock, no par value, of the Company ("Common Stock") designated on the signature page hereto.

b.    Holder acknowledges that the Company has entered into or will enter into an agreement with each subscriber ("Subscription Agreement") to the Company's convertible notes and warrants (the "Subscribers"), for the sale of an aggregate of up to $1,000,000 of principal amount of convertible promissory notes and warrants to the Subscribers (the "Offering"). Holder understands that, as a condition to proceeding with the Offering, the Subscribers have required, and the Company has agreed to assist the Subscribers in obtaining, an agreement from the Holder to refrain from selling any securities of the Company from the date of the Subscription Agreement and until the expiration of the Exclusion Period (as defined in Section 9(n) of the Subscription Agreement (the "Restriction Period").

2.    **Share Restriction.**

a.    Holder hereby agrees that during the Restriction Period, the Holder will not sell or otherwise dispose of any shares of Common Stock or any options, warrants or other rights to purchase shares of Common Stock or any other security of the Company which Holder owns or has a right to acquire as of the date hereof and the Closing Date (as defined in the Subscription Agreement), other than in connection with an offer made to all shareholders of the Company or any merger, consolidation or similar transaction involving the Company. Holder further agrees that the Company is authorized to and the Company agrees to place "stop orders" on its books to prevent any transfer of shares of Common Stock or other securities of the Company held by Holder in violation of this Agreement.

b.    Any subsequent issuance to and/or acquisition of shares or the right to acquire shares by Holder will be subject to the provisions of this Agreement.

c.    Notwithstanding the foregoing restrictions on transfer, the Holder may, at any time and from time to time during the Restriction Period, transfer the Common Stock (i) as bona fide gifts or transfers by will or intestacy, (ii) to any trust for the direct or indirect benefit of the undersigned or the immediate family of the Holder, provided that any such transfer shall not involve a disposition for value, (iii) to a partnership which is the general partner of a partnership of which the Holder is a general partner, provided, that, in the case of any gift or transfer described in clauses (i), (ii) or (iii), each donee or transferee agrees in writing prior to the transfer, to be bound by the terms and conditions contained herein in the same manner as such terms and conditions apply to the undersigned. For purposes hereof, "immediate family" means any relationship by blood, marriage or adoption, not more remote than first cousin.

32

3.     **Miscellaneous.**

a.     At any time, and from time to time, after the signing of this Agreement Holder will execute such additional instruments and take such action as may be reasonably requested by the Subscribers to carry out the intent and purposes of this Agreement.

b.     This Agreement shall be governed, construed and enforced in accordance with the laws of the State of New York without regard to conflicts of laws principles that would result in the application of the substantive laws of another jurisdiction, except to the extent that the securities laws of the state in which Holder resides and federal securities laws may apply. Any proceeding brought to enforce this Agreement may be brought exclusively in courts sitting in New York County, New York.

c.     This Agreement contains the entire agreement of the Holder with respect to the subject matter hereof.

d.     This Agreement shall be binding upon Holder, its legal representatives, successors and assigns.

e.     This Agreement may be signed and delivered by facsimile and such facsimile signed and delivered shall be enforceable.

f.     The Company agrees not to take any action or allow any act to be taken which would be inconsistent with this Agreement.

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, Holder has executed this Agreement as of the day and year first above written.

**HOLDER:**

_____
(Signature of Holder)

_____
(Print Name of Holder)

_____
Number of Shares of Common Stock
Beneficially Owned

**COMPANY:**

NESS ENERGY INTERNATIONAL, INC.

By: _____ CFO

33

## EXHIBIT F

## LIMITED STANDSTILL AGREEMENT

This AGREEMENT (the "Agreement") is made as of the /7ᵗʰ day of May, 2006, by the signatories hereto (each a "Holder"), in connection with his ownership of shares of Ness Energy International, Inc., a Washington corporation (the "Company").

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which consideration are hereby acknowledged, Holder agrees as follows:

### 1.    Background.

a.    Holder is the beneficial owner of the amount of shares of the Common Stock, no par value, of the Company ("Common Stock") designated on the signature page hereto.

b.    Holder acknowledges that the Company has entered into or will enter into an agreement with each subscriber ("Subscription Agreement") to the Company's convertible notes and warrants (the "Subscribers"), for the sale of an aggregate of up to $1,000,000 of principal amount of convertible promissory notes and warrants to the Subscribers (the "Offering"). Holder understands that, as a condition to proceeding with the Offering, the Subscribers have required, and the Company has agreed to assist the Subscribers in obtaining, an agreement from the Holder to refrain from selling any securities of the Company from the date of the Subscription Agreement and until the expiration of the Exclusion Period (as defined in Section 9(n) of the Subscription Agreement (the "Restriction Period").

### 2.    Share Restriction.

a.    Holder hereby agrees that during the Restriction Period, the Holder will not sell or otherwise dispose of any shares of Common Stock or any options, warrants or other rights to purchase shares of Common Stock or any other security of the Company which Holder owns or has a right to acquire as of the date hereof and the Closing Date (as defined in the Subscription Agreement), other than in connection with an offer made to all shareholders of the Company or any merger, consolidation or similar transaction involving the Company. Holder further agrees that the Company is authorized to and the Company agrees to place "stop orders" on its books to prevent any transfer of shares of Common Stock or other securities of the Company held by Holder in violation of this Agreement.

b.    Any subsequent issuance to and/or acquisition of shares or the right to acquire shares by Holder will be subject to the provisions of this Agreement.

c.    Notwithstanding the foregoing restrictions on transfer, the Holder may, at any time and from time to time during the Restriction Period, transfer the Common Stock (i) as bona fide gifts or transfers by will or intestacy, (ii) to any trust for the direct or indirect benefit of the undersigned or the immediate family of the Holder, provided that any such transfer shall not involve a disposition for value, (iii) to a partnership which is the general partner of a partnership of which the Holder is a general partner, provided, that, in the case of any gift or transfer described in clauses (i), (ii) or (iii), each donee or transferee agrees in writing prior to the transfer, to be bound by the terms and conditions contained herein in the same manner as such terms and conditions apply to the undersigned. For purposes hereof, "immediate family" means any relationship by blood, marriage or adoption, not more remote than first cousin.

3.    **Miscellaneous.**

a.    At any time, and from time to time, after the signing of this Agreement Holder will execute such additional instruments and take such action as may be reasonably requested by the Subscribers to carry out the intent and purposes of this Agreement.

b.    This Agreement shall be governed, construed and enforced in accordance with the laws of the State of New York without regard to conflicts of laws principles that would result in the application of the substantive laws of another jurisdiction, except to the extent that the securities laws of the state in which Holder resides and federal securities laws may apply.  Any proceeding brought to enforce this Agreement may be brought exclusively in courts sitting in New York County, New York.

c.    This Agreement contains the entire agreement of the Holder with respect to the subject matter hereof.

d.    This Agreement shall be binding upon Holder, its legal representatives, successors and assigns.

e.    This Agreement may be signed and delivered by facsimile and such facsimile signed and delivered shall be enforceable.

f.    The Company agrees not to take any action or allow any act to be taken which would be inconsistent with this Agreement.

IN WITNESS WHEREOF, and intending to be legally bound hereby, Holder has executed this Agreement as of the day and year first above written.

**HOLDER:**

_(Signature of Holder)_

_(Print Name of Holder)_

15,016,740
Number of Shares of Common Stock
Beneficially Owned

**COMPANY:**

NESS ENERGY INTERNATIONAL, INC.

By:_____

33

**EXHIBIT F**

**LIMITED STANDSTILL AGREEMENT**

This AGREEMENT (the "Agreement") is made as of the *12th* day of May, 2006, by the signatories hereto (each a "Holder"), in connection with his ownership of shares of Ness Energy International, Inc., a Washington corporation (the "Company").

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which consideration are hereby acknowledged, Holder agrees as follows:

### 1.   **Background.**

a.    Holder is the beneficial owner of the amount of shares of the Common Stock, no par value, of the Company ("Common Stock") designated on the signature page hereto.

b.    Holder acknowledges that the Company has entered into or will enter into an agreement with each subscriber ("Subscription Agreement") to the Company's convertible notes and warrants (the "Subscribers"), for the sale of an aggregate of up to $1,000,000 of principal amount of convertible promissory notes and warrants to the Subscribers (the "Offering"). Holder understands that, as a condition to proceeding with the Offering, the Subscribers have required, and the Company has agreed to assist the Subscribers in obtaining, an agreement from the Holder to refrain from selling any securities of the Company from the date of the Subscription Agreement and until the expiration of the Exclusion Period (as defined in Section 9(n) of the Subscription Agreement (the "Restriction Period").

### 2.   **Share Restriction.**

a.    Holder hereby agrees that during the Restriction Period, the Holder will not sell or otherwise dispose of any shares of Common Stock or any options, warrants or other rights to purchase shares of Common Stock or any other security of the Company which Holder owns or has a right to acquire as of the date hereof and the Closing Date (as defined in the Subscription Agreement), other than in connection with an offer made to all shareholders of the Company or any merger, consolidation or similar transaction involving the Company. Holder further agrees that the Company is authorized to and the Company agrees to place "stop orders" on its books to prevent any transfer of shares of Common Stock or other securities of the Company held by Holder in violation of this Agreement.

b.    Any subsequent issuance to and/or acquisition of shares or the right to acquire shares by Holder will be subject to the provisions of this Agreement.

c.    Notwithstanding the foregoing restrictions on transfer, the Holder may, at any time and from time to time during the Restriction Period, transfer the Common Stock (i) as bona fide gifts or transfers by will or intestacy, (ii) to any trust for the direct or indirect benefit of the undersigned or the immediate family of the Holder, provided that any such transfer shall not involve a disposition for value, (iii) to a partnership which is the general partner of a partnership of which the Holder is a general partner, provided, that, in the case of any gift or transfer described in clauses (i), (ii) or (iii), each donee or transferee agrees in writing prior to the transfer, to be bound by the terms and conditions contained herein in the same manner as such terms and conditions apply to the undersigned. For purposes hereof, "immediate family" means any relationship by blood, marriage or adoption, not more remote than first cousin.

32

3. **Miscellaneous.**

a.    At any time, and from time to time, after the signing of this Agreement Holder will execute such additional instruments and take such action as may be reasonably requested by the Subscribers to carry out the intent and purposes of this Agreement.

b.    This Agreement shall be governed, construed and enforced in accordance with the laws of the State of New York without regard to conflicts of laws principles that would result in the application of the substantive laws of another jurisdiction, except to the extent that the securities laws of the state in which Holder resides and federal securities laws may apply.  Any proceeding brought to enforce this Agreement may be brought exclusively in courts sitting in New York County, New York.

c.    This Agreement contains the entire agreement of the Holder with respect to the subject matter hereof.

d.    This Agreement shall be binding upon Holder, its legal representatives, successors and assigns.

e.    This Agreement may be signed and delivered by facsimile and such facsimile signed and delivered shall be enforceable.

f.    The Company agrees not to take any action or allow any act to be taken which would be inconsistent with this Agreement.

IN WITNESS WHEREOF, and intending to be legally bound hereby, Holder has executed this Agreement as of the day and year first above written.

**HOLDER:**

_____
(Signature of Holder)

_____
(Print Name of Holder)

_____
Number of Shares of Common Stock
Beneficially Owned

**COMPANY:**

NESS ENERGY INTERNATIONAL, INC.

By: _____

33

## EXHIBIT F

## LIMITED STANDSTILL AGREEMENT

This AGREEMENT (the "Agreement") is made as of the _17th_ day of May, 2006, by the signatories hereto (each a "Holder"), in connection with his ownership of shares of Ness Energy International, Inc., a Washington corporation (the "Company").

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which consideration are hereby acknowledged, Holder agrees as follows:

1.    **Background.**

    a.    Holder is the beneficial owner of the amount of shares of the Common Stock, no par value, of the Company ("Common Stock") designated on the signature page hereto.

    b.    Holder acknowledges that the Company has entered into or will enter into an agreement with each subscriber ("Subscription Agreement") to the Company's convertible notes and warrants (the "Subscribers"), for the sale of an aggregate of up to $1,000,000 of principal amount of convertible promissory notes and warrants to the Subscribers (the "Offering"). Holder understands that, as a condition to proceeding with the Offering, the Subscribers have required, and the Company has agreed to assist the Subscribers in obtaining, an agreement from the Holder to refrain from selling any securities of the Company from the date of the Subscription Agreement and until the expiration of the Exclusion Period (as defined in Section 9(n) of the Subscription Agreement (the "Restriction Period").

2.    **Share Restriction.**

    a.    Holder hereby agrees that during the Restriction Period, the Holder will not sell or otherwise dispose of any shares of Common Stock or any options, warrants or other rights to purchase shares of Common Stock or any other security of the Company which Holder owns or has a right to acquire as of the date hereof and the Closing Date (as defined in the Subscription Agreement), other than in connection with an offer made to all shareholders of the Company or any merger, consolidation or similar transaction involving the Company. Holder further agrees that the Company is authorized to and the Company agrees to place "stop orders" on its books to prevent any transfer of shares of Common Stock or other securities of the Company held by Holder in violation of this Agreement.

    b.    Any subsequent issuance to and/or acquisition of shares or the right to acquire shares by Holder will be subject to the provisions of this Agreement.

    c.    Notwithstanding the foregoing restrictions on transfer, the Holder may, at any time and from time to time during the Restriction Period, transfer the Common Stock (i) as bona fide gifts or transfers by will or intestacy, (ii) to any trust for the direct or indirect benefit of the undersigned or the immediate family of the Holder, provided that any such transfer shall not involve a disposition for value, (iii) to a partnership which is the general partner of a partnership of which the Holder is a general partner, provided, that, in the case of any gift or transfer described in clauses (i), (ii) or (iii), each donee or transferee agrees in writing prior to the transfer, to be bound by the terms and conditions contained herein in the same manner as such terms and conditions apply to the undersigned. For purposes hereof, "immediate family" means any relationship by blood, marriage or adoption, not more remote than first cousin.

3.    **Miscellaneous.**

a.    At any time, and from time to time, after the signing of this Agreement Holder will execute such additional instruments and take such action as may be reasonably requested by the Subscribers to carry out the intent and purposes of this Agreement.

b.    This Agreement shall be governed, construed and enforced in accordance with the laws of the State of New York without regard to conflicts of laws principles that would result in the application of the substantive laws of another jurisdiction, except to the extent that the securities laws of the state in which Holder resides and federal securities laws may apply.  Any proceeding brought to enforce this Agreement may be brought exclusively in courts sitting in New York County, New York.

c.    This Agreement contains the entire agreement of the Holder with respect to the subject matter hereof.

d.    This Agreement shall be binding upon Holder, its legal representatives, successors and assigns.

e.    This Agreement may be signed and delivered by facsimile and such facsimile signed and delivered shall be enforceable.

f.    The Company agrees not to take any action or allow any act to be taken which would be inconsistent with this Agreement.

IN WITNESS WHEREOF, and intending to be legally bound hereby, Holder has executed this Agreement as of the day and year first above written.

**HOLDER:**

(Signature of Holder)

(Print Name of Holder)

*9,692,745*

Number of Shares of Common Stock
Beneficially Owned

**COMPANY:**

NESS ENERGY INTERNATIONAL, INC.

By:

33

**EXHIBIT F**

**LIMITED STANDSTILL AGREEMENT**

This AGREEMENT (the "Agreement") is made as of the $17^{\underline{th}}$ day of May, 2006, by the signatories hereto (each a "Holder"), in connection with his ownership of shares of Ness Energy International, Inc., a Washington corporation (the "Company").

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which consideration are hereby acknowledged, Holder agrees as follows:

1.    **Background.**

a.    Holder is the beneficial owner of the amount of shares of the Common Stock, no par value, of the Company ("Common Stock") designated on the signature page hereto.

b.    Holder acknowledges that the Company has entered into or will enter into an agreement with each subscriber ("Subscription Agreement") to the Company's convertible notes and warrants (the "Subscribers"), for the sale of an aggregate of up to $1,000,000 of principal amount of convertible promissory notes and warrants to the Subscribers (the "Offering"). Holder understands that, as a condition to proceeding with the Offering, the Subscribers have required, and the Company has agreed to assist the Subscribers in obtaining, an agreement from the Holder to refrain from selling any securities of the Company from the date of the Subscription Agreement and until the expiration of the Exclusion Period (as defined in Section 9(n) of the Subscription Agreement (the "Restriction Period").

2.    **Share Restriction.**

a.    Holder hereby agrees that during the Restriction Period, the Holder will not sell or otherwise dispose of any shares of Common Stock or any options, warrants or other rights to purchase shares of Common Stock or any other security of the Company which Holder owns or has a right to acquire as of the date hereof and the Closing Date (as defined in the Subscription Agreement), other than in connection with an offer made to all shareholders of the Company or any merger, consolidation or similar transaction involving the Company. Holder further agrees that the Company is authorized to and the Company agrees to place "stop orders" on its books to prevent any transfer of shares of Common Stock or other securities of the Company held by Holder in violation of this Agreement.

b.    Any subsequent issuance to and/or acquisition of shares or the right to acquire shares by Holder will be subject to the provisions of this Agreement.

c.    Notwithstanding the foregoing restrictions on transfer, the Holder may, at any time and from time to time during the Restriction Period, transfer the Common Stock (i) as bona fide gifts or transfers by will or intestacy, (ii) to any trust for the direct or indirect benefit of the undersigned or the immediate family of the Holder, provided that any such transfer shall not involve a disposition for value, (iii) to a partnership which is the general partner of a partnership of which the Holder is a general partner, provided, that, in the case of any gift or transfer described in clauses (i), (ii) or (iii), each donee or transferee agrees in writing prior to the transfer, to be bound by the terms and conditions contained herein in the same manner as such terms and conditions apply to the undersigned. For purposes hereof, "immediate family" means any relationship by blood, marriage or adoption, not more remote than first cousin.

32

3.    **Miscellaneous.**

a.    At any time, and from time to time, after the signing of this Agreement Holder will execute such additional instruments and take such action as may be reasonably requested by the Subscribers to carry out the intent and purposes of this Agreement.

b.    This Agreement shall be governed, construed and enforced in accordance with the laws of the State of New York without regard to conflicts of laws principles that would result in the application of the substantive laws of another jurisdiction, except to the extent that the securities laws of the state in which Holder resides and federal securities laws may apply. Any proceeding brought to enforce this Agreement may be brought exclusively in courts sitting in New York County, New York.

c.    This Agreement contains the entire agreement of the Holder with respect to the subject matter hereof.

d.    This Agreement shall be binding upon Holder, its legal representatives, successors and assigns.

e.    This Agreement may be signed and delivered by facsimile and such facsimile signed and delivered shall be enforceable.

f.    The Company agrees not to take any action or allow any act to be taken which would be inconsistent with this Agreement.

IN WITNESS WHEREOF, and intending to be legally bound hereby, Holder has executed this Agreement as of the day and year first above written.

**HOLDER:**

(Signature of Holder)

(Print Name of Holder)

18 115 559
Number of Shares of Common Stock
Beneficially Owned

**COMPANY:**

NESS ENERGY INTERNATIONAL, INC.

By:

33

Additional Issuances. There are no outstanding agreements or preemptive or similar rights affecting the Company's common stock or equity and no outstanding rights, warrants or options to acquire, or instruments convertible into or exchangeable for, or agreements or understandings with respect to the sale or issuance of any shares of common stock or equity of the Company or other equity interest in any of the Subsidiaries of the Company except as described on **Schedule 5(d)**. The Common stock of the Company on a fully diluted basis outstanding as of the last trading day preceding the Closing Date is set forth on **Schedule 5(d)**.

Schedule 5(d)

There are no additional outstanding agreements that could effect the Company's common stock or equity that have not been disclosed on the Company's Financial Statements, or SEC Filings.

No Undisclosed Liabilities. The Company has no liabilities or obligations which are material, individually or in the aggregate, which are not disclosed in the Reports and Other Written Information, other than those incurred in the ordinary course of the Company's businesses since the Latest Financial Date, and which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, except as disclosed on **Schedule 5(q)**.

Schedule 5(q)

The Company has no liabilities or obligations which are material, individually or in the aggregate, which are not disclosed in the Reports and Other Written Information, other than those incurred in the ordinary course of the Company's businesses since the Latest Financial Date, and which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, except as disclosed as of the closing date.

DTC Status/Transfer Agent. The Company's transfer agent is eligible to participate in and the Common Stock is eligible for transfer pursuant to the Depository Trust Company Automated Securities Transfer Programs. The name, address, telephone number, fax number, contact person and email address of the Company transfer agent are set forth on **Schedule 5(v)** hereto.

Schedule 5(v)

Heidi Sadowski
Office Manager
Fidelity Transfer Company
1800 South West Temple, Ste. 301
Salt Lake City, UT 84115
Phone #801/484-7222
Fax #801/466-4122
Email: heidi@fidelitytransfer.com

(e)    Use of Proceeds. The proceeds of the Offering will be employed by the Company for the purposes set forth on **Schedule 9(e)** hereto. Except as set forth on **Schedule 9(e)**, the Purchase Price may not and will not be used for accrued and unpaid officer and director salaries, payment of financing related debt, redemption of outstanding notes or equity instruments of the Company, litigation related expenses or settlements, brokerage fees, nor non-trade obligations outstanding on a Closing Date. For so long as any Notes are outstanding, the Company will not prepay any financing related debt obligations, nor redeem any equity instruments of the Company.

Schedule 9(e)

Use of Proceeds:

| | |
|---|---|
| Projected proceeds: | $880,000 |
| Legal fees | $25,000 |
| Broker Fees | $70,000 |
| Operating expenses | $585,000 |
| Land Acquisition and Well Expansion | $200,000 |

(iv)    engage in any transactions with any officer, director, employee or any Affiliate of the Company, including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner, in each case in excess of $10,000 other than (i) for payment of salary or consulting fees for services rendered, (ii) reimbursement for expenses incurred on behalf of the Company, (iii) for other employee benefits, including stock option agreements under any stock option plan of the Company, and (iv) for mineral rights, or interest previously owned by officers, directors, or employees of the Company as described on **Schedule 9(r)**.

Schedule 9(r)

SHA STEPHENS
4201 E I-20 SERVICE RD
WILLOW PARK, TX 76087

| Property Name | Billing % | Revenue% |
|---|---|---|
| ATOKA - GOHLKE #1 | | 0.938% |
| BYRD #1 | | 2.500% |
| BYRD UNIT #1 | | 2.516% |
| D.L. HART 10 | | 1.500% |
| D.L. HART #1 | | 1.500% |
| D.L. HART #2 | | 1.500% |
| D.L. HART #3 | | 1.500% |
| D.L. HART #4 | | 1.500% |
| D.L. HART #5 | | 1.500% |
| D.L. HART #6 | | 1.500% |

| | | |
|---|---|---|
| D.L. HART #7 | | 1.500% |
| D.L. HART #8 | | 1.500% |
| ELLIS B 3 | | 2.618% |
| GOHLKE DEEP GAS U | | 1.563% |
| LEONARD #1 | | 1.750% |
| LESTER B1 | | 2.500% |
| RESPONDEK #1 | | 0.938% |
| D.L. HART #3 | 4.000% | 3.000% |
| GOHLKE DEEP GAS U | 0.500% | 0.375% |

JF Hoover
4201 E I-20 SERVICE RD
WILLOW PARK, TX 76087

| | | |
|---|---|---|
| ATOKA - GOHLKE #1 | 0.00 | 1.875% |
| GOHLKE DEEP GAS U | 0.00 | 3.125% |
| RESPONDEK #1 | 0.00 | 1.875% |

Officer's pursuant to their employment agreements, receive certain royalty overrides based on profitability of individual well projects.

(s)  Limited Standstill.  The Company will deliver to the Subscribers on or before the Closing Date and enforce the provisions of irrevocable standstill agreements ("**Limited Standstill Agreements**") in the form annexed hereto as **Exhibit F**, with the parties identified on **Schedule 9(s)** hereto, who comprise all owners beneficially or otherwise, of 2.5% or more of the Company's Common Stock and options or rights to acquire Common Stock.

There are four stockholders who would be required to sign standstill agreements:

| | |
|---|---|
| Shannon K Stephens | 18,145,599shares |
| Hayseed Stephens,Oil Inc. | 4,692,745shares |
| Stacey Stephens | 17,563,763shares |
| Mary Gene Stephens | 19,016,740shares |

12(a) Exceptions,

All outstanding and authorized Shares.

## Schedule 8

### Broker

Broker:        KMR CAPITAL, LLC, a division of MidAmerica Financial Services Inc.
353 East Mill Street
New Braunfels, TX 78130
Fax: (830) 626-7444

     Cash Fee. The Company agrees that it will pay the Broker, on the Closing Date a fee of seven percent (7%) of the Purchase Price ("Broker's Cash Fee"). The Company represents that there are no other parties entitled to receive fees, commissions, or similar payments in connection with the Offering except the Broker.

     Broker's Warrants. On the Closing Date, the Company will issue to the Broker, share purchase warrants similar to and carrying the same rights as the Class A Warrants issuable to the Subscribers ("Broker's Warrants") except that the Broker's Warrants will be exercisable for five years from the Closing Date at an exercise price equal to the lesser of $0.155, or 100% of the closing bid price of the Common Stock as reported by Bloomberg L.P. for the Principal Market for the trading day preceding the Closing Date. The Broker will receive, in the aggregate, five (5) Broker's Warrants for each one hundred (100) Shares issuable on the Closing Date.

     All the representations, covenants, warranties, undertakings, remedies, liquidated damages, indemnification, and other rights including but not limited to reservation and registration rights made or granted to or for the benefit of the Subscribers are hereby also made by the Company and granted to the holders of the Broker's Warrants.

34

# Exhibit B

THIS NOTE AND THE COMMON SHARES ISSUABLE UPON
CONVERSION OF THIS NOTE HAVE NOT BEEN REGISTERED
UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THIS NOTE
AND THE COMMON SHARES ISSUABLE UPON CONVERSION OF
THIS NOTE MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR
HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE
REGISTRATION STATEMENT AS TO THIS NOTE UNDER SAID ACT
OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO
NESS ENERGY INTERNATIONAL, INC. THAT SUCH REGISTRATION
IS NOT REQUIRED.

**Principal Amount $454,545.46**                         **Issue Date: May 31, 2006**
**Purchase Price $400,000.00**

## CONVERTIBLE NOTE

FOR VALUE RECEIVED, NESS ENERGY INTERNATIONAL, INC., a Washington
corporation (hereinafter called "Borrower"), hereby promises to pay to ALPHA CAPITAL
AKTIENGESELLSCHAFT, Pradafant 7, 9490 Furstentums, Vaduz, Lichtenstein, Fax: 011-42-32323196
(the "Holder") or order, without demand, the sum of FOUR HUNDRED FIFTY-FOUR THOUSAND
FIVE HUNDRED FORTY-FIVE DOLLARS AND FORTY-SIX CENTS ($454,545.46), on May 31,
2007 (the "Maturity Date"), if not retired sooner.

This Note has been entered into pursuant to the terms of a subscription agreement between the
Borrower and the Holder, dated of even date herewith (the "Subscription Agreement"), and shall be
governed by the terms of such Subscription Agreement. Unless otherwise separately defined herein, all
capitalized terms used in this Note shall have the same meaning as is set forth in the Subscription
Agreement. The following terms shall apply to this Note:

### ARTICLE 1

### GENERAL PROVISIONS

1.1     Payment Grace Period. The Borrower shall have a ten (10) day grace period to pay any
monetary amounts due under this Note, after which grace period and during the pendency of any other
Event of Default (as defined below) a default interest rate of fifteen percent (15%) per annum shall apply
to the amounts owed hereunder.

1.2     Conversion Privileges. The Conversion Privileges set forth in Article II shall remain in
full force and effect immediately from the date hereof and until the Note is paid in full regardless of the
occurrence of an Event of Default. Unless previously converted into Common Stock in accordance with
Article II hereof, the Note shall be payable in full on the Maturity Date, provided, that if an Event of
Default has occurred, the Borrower may extend the Maturity Date up to an amount of time equal to the
pendency of the Event of Default. Such extension must be on notice in writing.

## ARTICLE II

## CONVERSION RIGHTS

The Holder shall have the right to convert the principal and any interest due under this Note into Shares of the Borrower's Common Stock, no par value per share ("Common Stock") as set forth below.

2.1.    Conversion into the Borrower's Common Stock.

(a)    The Holder shall have the right from and after the date of the issuance of this Note and then at any time until this Note is fully paid, to convert any outstanding and unpaid principal portion of this Note, at the election of the Holder (the date of giving of such notice of conversion being a "Conversion Date") into fully paid and nonassessable shares of Common Stock as such stock exists on the date of issuance of this Note, or any shares of capital stock of Borrower into which such Common Stock shall hereafter be changed or reclassified, at the conversion price as defined in Section 2.1(b) hereof (the "Conversion Price"), determined as provided herein. Upon delivery to the Borrower of a completed Notice of Conversion, a form of which is annexed hereto, Borrower shall issue and deliver to the Holder within three (3) business days after the Conversion Date (such third day being the "Delivery Date") that number of shares of Common Stock for the portion of the Note converted in accordance with the foregoing. At the election of the Holder, the Borrower will deliver accrued but unpaid interest on the Note, if any, through the Conversion Date directly to the Holder on or before the Delivery Date (as defined in the Subscription Agreement). The number of shares of Common Stock to be issued upon each conversion of this Note shall be determined by dividing that portion of the principal of the Note to be converted by the Conversion Price.

(b)    Subject to adjustment as provided in Section 2.1(c) hereof, the Conversion Price per share shall be $0.155.

(c)    The Conversion Price and number and kind of shares or other securities to be issued upon conversion determined pursuant to Section 2.1(a), shall be subject to adjustment from time to time upon the happening of certain events while this conversion right remains outstanding, as follows:

A.    Merger, Sale of Assets, etc. If the Borrower at any time shall consolidate with or merge into or sell or convey all or substantially all its assets to any other corporation, this Note, as to the unpaid principal portion thereof and accrued interest thereon, shall thereafter be deemed to evidence the right to purchase such number and kind of shares or other securities and property as would have been issuable or distributable on account of such consolidation, merger, sale or conveyance, upon or with respect to the securities subject to the conversion or purchase right immediately prior to such consolidation, merger, sale or conveyance. The foregoing provision shall similarly apply to successive transactions of a similar nature by any such successor or purchaser. Without limiting the generality of the foregoing, the anti-dilution provisions of this Section shall apply to such securities of such successor or purchaser after any such consolidation, merger, sale or conveyance.

B.    Reclassification, etc. If the Borrower at any time shall, by reclassification or otherwise, change the Common Stock into the same or a different number of securities of any class or classes that may be issued or outstanding, this Note, as to the unpaid principal portion thereof and accrued interest thereon, shall thereafter be deemed to evidence the right to purchase an adjusted number of such securities and kind of securities as would have been issuable as the result of such change with respect to the Common Stock immediately prior to such reclassification or other change.

    C. Stock Splits, Combinations and Dividends. If the shares of Common Stock are subdivided or combined into a greater or smaller number of shares of Common Stock, or if a dividend is paid on the Common Stock in shares of Common Stock, the Conversion Price shall be proportionately reduced in case of subdivision of shares or stock dividend or proportionately increased in the case of combination of shares, in each such case by the ratio which the total number of shares of Common Stock outstanding immediately after such event bears to the total number of shares of Common Stock outstanding immediately prior to such event..

    D. Share Issuance. So long as this Note is outstanding, if the Borrower shall issue or agree to issue any shares of Common Stock except for the Excepted Issuances (as defined in the Subscription Agreement) for a consideration less than the Conversion Price in effect at the time of such issue, then, and thereafter successively upon each such issue, the Conversion Price shall be reduced to such other lower issue price. For purposes of this adjustment, the issuance of any security carrying the right to convert such security into shares of Common Stock or of any warrant, right or option to purchase Common Stock shall result in an adjustment to the Conversion Price upon the issuance of the above-described security and again upon the issuance of shares of Common Stock upon exercise of such conversion or purchase rights if such issuance is at a price lower than the then applicable Maximum Base Price. The reduction of the Conversion Price described in this paragraph is in addition to other rights of the Holder described in this Note and the Subscription Agreement.

    (d) Whenever the Conversion Price is adjusted pursuant to Section 2.1(c) above, the Borrower shall promptly mail to the Holder a notice setting forth the Conversion Price after such adjustment and setting forth a statement of the facts requiring such adjustment.

    (e) During the period the conversion right exists, Borrower will reserve from its authorized and unissued Common Stock a sufficient number of shares to provide for the issuance of Common Stock issuable upon the full conversion of this Note and as described in the Subscription Agreement. Borrower represents that upon issuance, such shares will be duly and validly issued, fully paid and non-assessable. Borrower agrees that its issuance of this Note shall constitute full authority to its officers, agents, and transfer agents who are charged with the duty of executing and issuing stock certificates to execute and issue the necessary certificates for shares of Common Stock upon the conversion of this Note.

    2.2 Method of Conversion. This Note may be converted by the Holder in whole or in part as described in Section 2.1(a) hereof and the Subscription Agreement. Upon partial conversion of this Note, a new Note containing the same date and provisions of this Note shall, at the request of the Holder, be issued by the Borrower to the Holder for the principal balance of this Note and interest which shall not have been converted or paid.

    2.3 Maximum Conversion. The Holder shall not be entitled to convert on a Conversion Date that amount of the Note in connection with that number of shares of Common Stock which would be in excess of the sum of (i) the number of shares of Common Stock beneficially owned by the Holder and its affiliates on a Conversion Date, (ii) any Common Stock issuable in connection with the unconverted portion of the Note, and (iii) the number of shares of Common Stock issuable upon the conversion of the Note with respect to which the determination of this provision is being made on a Conversion Date, which would result in beneficial ownership by the Holder and its affiliates of more than 4.99% of the outstanding shares of Common Stock of the Borrower on such Conversion Date. For the purposes of the provision to the immediately preceding sentence, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended, and Regulation 13d-3 thereunder. Subject to the foregoing, the Holder shall not be limited to aggregate conversions of

only 4.99% and aggregate conversion by the Holder may exceed 4.99%. The Holder shall have the authority and obligation to determine whether the restriction contained in this Section 2.3 will limit any conversion hereunder and to the extent that the Holder determines that the limitation contained in this Section applies, the determination of which portion of the Notes are convertible shall be the responsibility and obligation of the Holder. The Holder may waive the conversion limitation described in this Section 2.3, in whole or in part, upon and effective after 61 days prior written notice to the Borrower to increase such percentage to up to 9.99%. The Holder may allocate which of the equity of the Borrower deemed beneficially owned by the Holder shall be included in the 4.99% amount or up to 9.99% amount as described above.

        2.4     Optional Redemption of Principal Amount. Provided an Event of Default or an event which with the passage of time or the giving of notice could become an Event of Default has not occurred, whether or not such Event of Default has been cured, the Borrower will have the option of prepaying the outstanding Principal amount of this Note ("Optional Redemption"), in whole or in part, by paying to the Holder a sum of money equal to one hundred and twenty percent (120%) of the Principal amount to be redeemed, together with accrued but unpaid interest thereon, if any, and any and all other sums due, accrued or payable to the Holder arising under this Note or any Transaction Document through the Redemption Payment Date as defined below (the "Redemption Amount"). Borrower's election to exercise its right to prepay must be by notice in writing ("Notice of Redemption"). A Notice of Redemption may be given only within five days after the closing price of the Common Stock as reported by Bloomberg L.P. for the Principal Market is less than $0.155 for five consecutive trading days ("Lookback Period"). The Notice of Redemption shall specify the date for such Optional Redemption (the "Redemption Payment Date"), which date shall be thirty (30) days after the date of the Notice of Redemption (the "Redemption Period"). A Notice of Redemption may not be given or fulfilled unless the Registration Statement (as defined in the Subscription Agreement) has been effective for the unrestricted public resale of the Registrable Securities (as defined in the Subscription Agreement) each day during the Lookback Period and through the Redemption Payment Date. The amount of Note principal included in a Notice of Redemption shall be reduced to an amount that would not cause the Holder to exceed the limitation described in Section 2.3 of this Note if the amount of Note Principal being redeemed was instead converted pursuant to Section 3.1. A Notice of Redemption shall not be effective with respect to any portion of the Principal Amount for which the Holder has a pending election to convert or for which a Conversion Notice is given during the Redemption Period. On the Redemption Payment Date, the Redemption Amount shall be paid in good funds to the Holder. In the event the Borrower fails to pay the Redemption Amount on the Redemption Payment Date as set forth herein, then (i) such Notice of Redemption will be null and void, (ii) Borrower will have no right to deliver another Notice of Redemption, and (iii) Borrower's failure may be deemed by Holder to be a non-curable Event of Default. A Notice of Redemption may not be given nor may the Borrower effectuate a Redemption without the consent of the Holder, if at any time during the Redemption Period an Event of Default or an Event which with the passage of time or giving of notice could become an Event of Default (whether or not such Event of Default has been cured), has occurred. A Notice of Redemption must be given to all Holders of Notes similar to this Note, in proportion to the amount of Note Principal held by all Holders of such Notes. Except as described in this Section 2.4, the Note may not be paid prior to the Maturity Date without the consent of the Holder.

## ARTICLE III

## EVENT OF DEFAULT

        The occurrence of any of the following events of default ("Event of Default") shall, at the option of the Holder hereof, make all sums of principal and interest then remaining unpaid hereon and all

other amounts payable hereunder immediately due and payable, upon demand, without presentment, or grace period, all of which hereby are expressly waived, except as set forth below:

        3.1    Failure to Pay Principal or Interest. The Borrower fails to pay any installment of principal, interest or other sum due under this Note when due and such failure continues for a period of ten (10) days after the due date. The ten (10) day period described in this Section 3.1 is the same ten (10) day period described in Section 1.1 hereof.

        3.2    Breach of Covenant. The Borrower breaches any material covenant or other term or condition of the Subscription Agreement or this Note in any material respect and such breach, if subject to cure, continues for a period of ten (10) business days after written notice to the Borrower from the Holder.

        3.3    Breach of Representations and Warranties. Any material representation or warranty of the Borrower made herein, in the Subscription Agreement, or in any agreement, statement or certificate given in writing pursuant hereto or in connection therewith shall be false or misleading in any material respect as of the date made and the Closing Date.

        3.4    Receiver or Trustee. The Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business; or such a receiver or trustee shall otherwise be appointed.

        3.5    Judgments. Any money judgment, writ or similar final process shall be entered or filed against Borrower or any of its property or other assets for more than $50,000, and shall remain unvacated, unbonded or unstayed for a period of forty-five (45) days.

        3.6    Bankruptcy. Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings or relief under any bankruptcy law or any law, or the issuance of any notice in relation to such event, for the relief of debtors shall be instituted by or against the Borrower and if instituted against Borrower are not dismissed within 45 days of initiation.

        3.7    Delisting. Delisting of the Common Stock from the OTC Bulletin Board ("Bulletin Board") or Principal Market; failure to comply with the requirements for continued listing on the Bulletin Board for a period of five consecutive trading days; or notification from the Bulletin Board or any Principal Market that the Borrower is not in compliance with the conditions for such continued listing on the Bulletin Board or other Principal Market.

        3.8    Non-Payment. A default by the Borrower under any one or more obligations in an aggregate monetary amount in excess of $100,000 for more than twenty days after the due date, unless the Borrower is contesting the validity of such obligation in good faith.

        3.9    Stop Trade. A Securities and Exchange Commission or judicial stop trade order or Principal Market trading suspension that lasts for five or more consecutive trading days.

        3.10   Failure to Deliver Common Stock or Replacement Note. Borrower's failure to timely deliver Common Stock to the Holder pursuant to and in the form required by this Note and Sections 7 and 11 of the Subscription Agreement, or, if required, a replacement Note.

        3.11   Non-Registration Event. The occurrence of a Non-Registration Event as described in Section 11.4 of the Subscription Agreement.

3.12    Reservation Default.  Failure by the Borrower to have reserved for issuance upon conversion of the Note the amount of Common stock as set forth in this Note and the Subscription Agreement.

3.13    Cross Default.  A default by the Borrower of a material term, covenant, warranty or undertaking of any other agreement to which the Borrower and Holder are parties, or the occurrence of a material event of default under any such other agreement which is not cured after any required notice and/or cure period.

## ARTICLE IV

## MISCELLANEOUS

4.1    Failure or Indulgence Not Waiver.  No failure or delay on the part of Holder hereof in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.  All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

4.2    Notices.  All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice.  Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.  The addresses for such communications shall be: (i) if to the Borrower to: Ness Energy International, Inc., 4201 East Interstate 20, Willow Park, TX 76087, Attn: JF Hoover, CFO, telecopier: (817) 597-4303, with a copy by telecopier only to: Kevin Woltjen, Woltjen Law Firm, 4144 North Central Expressway, Suite 410, Dallas, TX 75204, telecopier: (214) 742-5545, and (ii) if to the Holder, to the name, address and telecopy number set forth on the front page of this Note, with a copy by telecopier only to Grushko & Mittman, P.C., 551 Fifth Avenue, Suite 1601, New York, New York 10176, telecopier number: (212) 697-3575.

4.3    Amendment Provision.  The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument as originally executed, or if later amended or supplemented, then as so amended or supplemented.

4.4    Assignability.  This Note shall be binding upon the Borrower and its successors and assigns, and shall inure to the benefit of the Holder and its successors and assigns.  The Borrower may not assign any of its obligations under this Note without the consent of the Holder.

4.5      Cost of Collection. If default is made in the payment of this Note, Borrower shall pay the Holder hereof reasonable costs of collection, including reasonable attorneys' fees.

4.6      Governing Law. This Note shall be governed by and construed in accordance with the laws of the State of New York. Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of New York or in the federal courts located in the state of New York. Both parties and the individual signing this Agreement on behalf of the Borrower agree to submit to the jurisdiction of such courts. The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs.

4.7      Maximum Payments. Nothing contained herein shall be deemed to establish or require the payment of a rate of interest or other charges in excess of the maximum permitted by applicable law. In the event that the rate of interest required to be paid or other charges hereunder exceed the maximum permitted by such law, any payments in excess of such maximum shall be credited against amounts owed by the Borrower to the Holder and thus refunded to the Borrower.

4.8      Shareholder Status. The Holder shall not have rights as a shareholder of the Borrower with respect to unconverted portions of this Note. However, the Holder will have all the rights of a shareholder of the Borrower with respect to the shares of Common Stock to be received by Holder after delivery by the Holder of a Conversion Notice to the Borrower.

**IN WITNESS WHEREOF**, Borrower has caused this Note to be signed in its name by an authorized officer as of the 31 day of May, 2006.

NESS ENERGY INTERNATIONAL, INC.

By: _____
   Name: J.F. Hoar
   Title: CEO

WITNESS:

Cheryl L Couch

## NOTICE OF CONVERSION

(To be executed by the Registered Holder in order to convert the Note)

The undersigned hereby elects to convert $_____ of the principal and $_____ of the interest due on the Note issued by Ness Energy International, Inc. on May 31, 2006 into Shares of Common Stock of Ness Energy International, Inc. (the "Borrower") according to the conditions set forth in such Note, as of the date written below.

Date of Conversion:_____

Conversion Price:_____

Shares To Be Delivered:_____

Signature:_____

Print Name:_____

Address:_____

_____

# Exhibit C

# Grushko & Mittman, P.C.

Attorneys at Law
551 Fifth Avenue, Suite 1601
New York, New York 10176
(212) 697-9500 (Telephone)
(212) 697-3575 (Telecopier)
counslers@aol.com (e-mail)

**Edward M. Grushko**
**Barbara R. Mittman**
**Eliezer Drew - Admitted NY/NJ**

July 31, 2007

VIA FACSIMILE and FIRST CLASS MAIL

Sha Stephens, President and CEO
Ness Energy International, Inc.
1508 Santa Fe, Suite 202
Weatherford, Texas 76086
Fax:    (817) 598-0440

**Re:    Event of Default**

Dear Mr. Stephens:

I am writing to you on behalf of my client, Alpha Capital Anstalt ("Alpha"), regarding a convertible note (the "Note") issued by Ness Energy International, Inc. (the "Ness") to Alpha in the original principal amount of $454,545.46 pursuant to the Subscription Agreement dated May 31, 2006 (the "Subscription Agreement").

The Note was due on May 31, 2007 (the "Maturity Date"). Ness failed to make payment of all sums due under the note on the Maturity Date and during the ten day grace period thereafter. Pursuant to sections 1.1 and 3.1 of the Note, Ness' failure to make the payment resulted in interest at the rate of 15% to begin accruing. To date Ness owes Alpha $464,072.23. Interest is continuing to accrue at the rate of $186.80 a day.

Demand is hereby made that Ness pay all sums due under the Note no later than Monday, August 10, 2007 or Alpha will take all steps necessary, including litigation, to enforce its rights and protect its interests.

Very truly yours,

GRUSHKO & MITTMAN, P.C.

*Eliezer Drew*

Eliezer Drew

cc:    Kevin Woltjen, Esq.    (via fax: (214) 742-5545)

# Grushko & Mittman, P.C.

Attorneys at Law
551 Fifth Avenue, Suite 1601
New York, New York 10176
(212) 697-9500 (Telephone)
(212) 697-3575 (Telecopier)
counslers@aol.com (e-mail)

*Edward M. Grushko*
*Barbara R. Mittman*
*Eliezer Drew - Admitted NY/NJ*

September 12, 2007

VIA FACSIMILE and FIRST CLASS MAIL

Sha Stephens, President and CEO
Ness Energy International, Inc.
1508 Santa Fe, Suite 202
Weatherford, Texas 76086
Fax:   (817) 598-0440

**Re:    Event of Default**

Dear Mr. Stephens:

I am writing to you on behalf of my client, Alpha Capital Anstalt ("Alpha"), regarding a convertible note (the "Note") issued by Ness Energy International, Inc. (the "Ness") to Alpha in the original principal amount of $454,545.46 pursuant to the Subscription Agreement dated May 31, 2006 (the "Subscription Agreement").

As I wrote previously, the Note was due on May 31, 2007 (the "Maturity Date"). Ness failed to make payment of all sums due under the note on the Maturity Date and during the ten day grace period thereafter. Pursuant to sections 1.1 and 3.1 of the Note, Ness' failure to make the payment resulted in interest at the rate of 15% to begin accruing. To date Ness owes Alpha $464,072.23. Interest is continuing to accrue at the rate of $186.80 a day.

Alpha demands immediate payment of all sums due. Additionally, Alpha has began its collection action against Ness.

Very truly yours,

GRUSHKO & MITTMAN, P.C.

Eliezer Drew

cc:     Kevin Woltjen, Esq.   (via fax: (214) 742-5545)